UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| Emelida Cordova, | ) | Case No. 19bk06255 |
| | ) | |
| Debtor. | ) | Chapter 13 |
| | ) | |
| _____ | ) | |
| | ) | |
| Emelida Cordova, Sabrina M. Hightower, Kaila Selice Hill, Demiko J. Little, Shelia Holman, Joyce L. Johnson, Annie B. Williams, Larry Bernard Cherry, Gloria Jean Lewis, Stephen Randall Banks, III, Christina C. Thirston, Krystle Chalmers, Natasha Marie McDonald, Andrew Christopher Ferrell, Leo Paul Reeder, Jr., Calvin Dixon, Breonca Hyles, Preal Jones, Tevida B. Nocentelli, Roshelle Kinchen, Felix Rivera, Craig E. Payne & Harriett Payne, Larry J. Outlaw, Bernard Powell, Marilyn Pagan, Helen E. Henning, Christopher Campbell, Tyrone Williams, Tabitha Chatmon, Magic J. Jones, Dwayne E. Kennedy, Tatiana Marshall, Kendric Sandifer, Dontrea S. Jones, Trevor E. Baxter, Taquesha Newton, Ronald B. Williams, Lamont McBride, Larry B. Purnell, Laterence Mitchell, Rashanda Hogan-Mitchell, Ira Haymore,[1] Brandon W. Brown, Camelia Binder, Ameshia Odom, Montine Osbey, Deion Sanders, Victor G. Perez, Nutasha L. Davis, Steven A. Williams, August L. Brown and Maricela Barrera, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Adv. No. 19ap00684

Judge Timothy A. Barnes |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| City of Chicago, | ) | |
| | ) | |
| Defendant. | ) | |

TIMOTHY A. BARNES, Judge.

MEMORANDUM DECISION

Bankruptcy is one of the most essential elements of capitalism.  It is the safety net that encourages economic risk-taking by deferring the effects of failure.  Without it, less risks will be

---

[1]    On March 4, 2024, the Plaintiffs (defined below) filed a Suggestion of Death of Plaintiff Ira Haymore [Adv. Dkt No. 444].  In that filing, the Plaintiffs state that "[c]ounsel withdraws Ira Haymore as a proposed class representative."  As best of the court's ability to determine, the Plaintiffs have not however taken any step to remove Ira Haymore as a plaintiff in the matter, though they have removed Haymore from their captioned filings.  Without such a request, the court declines to order *sua sponte* that Ira Haymore be dropped from the matter.

taken and, as a result, less progress will be made. The fundamental need for robust bankruptcy laws crosses borders and ideologies. Even countries less reliant on capitalism than ours have bankruptcy laws.[2]

One of the most important roles played by those robust laws is to level the playing field between parties.[3] While fundamental rights such as property interests are reflected, creditors are subjected to the same procedures and restraints no matter what their power may be outside of bankruptcy.[4] And there is no more powerful creditor outside of bankruptcy than the state.[5] Whether it be local, state or federal governments, when governments act as creditors, they have the ability to tilt the playing field unfairly as to debtors and other creditors. That is, in many ways, what this case is about. The City of Chicago has for a number of years used its superior power as a state actor to protect its regressive tax system of parking ticket revenue. That has been done in a way that has been shown to disproportionately disadvantage the poorest of Chicago's residents.[6] Outside of bankruptcy, the City's power is nearly unlimited – as this case and the related disputes before this court over the past years have shown.[7]

Inside bankruptcy is another matter. This country's founders had the foresight to make bankruptcy a federal matter by enshrining it in the Constitution.[8] As a result, bankruptcy law is federal and federal law, in most instances, trumps state law. Congress, in enacting the present

---

[2]     *See e.g.*, Enterprise Bankruptcy Law of the People's Republic of China (effective June 1, 2007).

[3]     *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1346 (7th Cir. 1987) ("[T]he Bankruptcy Code's ultimate goal of balancing the equities and interests of all affected parties in a bankruptcy case."); *Begier v. I.R.S.*, 496 U.S. 53, 54 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code …."); *In re Chas. A. Stevens & Co.*, 109 B.R. 853, 856 (Bankr. N.D. Ill. 1990) (describing how for purposes of 11 U.S.C. § 362, "the Code and the Rules establish a level playing field for all professionals who seek compensation from estate assets"); *Cordova v. City of Chicago (In re Cordova)*, 635 B.R. 321, 336 (Bankr. N.D. Ill. 2021) (Barnes, J.) (discussing how the automatic stay provides protections and benefits to both debtors and creditors).

[4]     *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 391(2023) (emphasizing that the provisions of the Bankruptcy Code apply to *all* creditors, including governmental ones).

[5]     *Hoffman v. Connecticut Dep't of Income Maint.*, 492 U.S. 96, 110 (1989) (Marshall, J., dissenting). *Hoffman*, in interpreting a prior version of section 106 of the Bankruptcy Code, concluded that a state's sovereign immunity was not indirectly waived thereby with respect to section 542. *Id.* at 103. *Hoffman* did affirm, however, Congress's power to waiver Eleventh Amendment sovereign immunity, *id.* at 101, and Congress has since rewritten section 106 so as to directly waiver state sovereign immunity of the states with respect to section 542. *See* 11 U.S.C. § 106(a)(1).

[6]     *See, e.g.*, Melissa Sanchez and Sandhya Kambhampati, *How Chicago Ticket Debt Sends Black Motorists Into Bankruptcy*, PROPUBLICA (February 27, 2018) [available at https://features.propublica.org/driven-into-debt/chicago-ticket-debt-bankruptcy/] [last visited March 6, 2025].

[7]     *See e.g.*, *City of Chicago, Illinois v. Fulton*, 592 U.S. 154 (2021); *City of Chicago v. Kennedy*, Case No. 17 CV 5945, 2018 WL 2087453 (N.D. Ill. May 4, 2018); *Baines v. City of Chicago*, 584 B.R. 723 (N.D. Ill. 2018); *In re Hicks*, 582 B.R. 6 (Bankr. N.D. Ill. 2018) (Schmetterer, J.); *In re Avila*, 566 B.R. 558 (Bankr. N.D. Ill. 2017) (Cassling, J.).

[8]     U.S. Const. Art. I, § 8, cl. 4.

2

Bankruptcy Code[9] and later responding to Supreme Court precedent narrowing the power of bankruptcy courts to curtail inappropriate action by state creditors,[10] had the additional foresight to waive expressly sovereign immunity of states and state actors in the context of the Bankruptcy Code.[11] That means that state actors such as the City of Chicago are required to obey the procedures and restraints of the Bankruptcy Code as any other creditor would or face the consequences.

Nonetheless, bankruptcy courts are not all powerful in their ability to enforce those procedures and restraints. It is common parlance to refer to the bankruptcy courts as courts of equity.[12] They are not. Law and equity were merged in this country's court systems nearly a century ago.[13] Bankruptcy courts, like any other court of the United States, are bound to apply statutes, rules and binding precedent. Even were this court to find that the City's actions violate the Bankruptcy Code, which it expressly does not do here, the remedies that might apply must find their source in those statutes, rules and binding precedent. Further, and more to the point here, whether or not the City acted appropriately, this court must apply those statutes, rules and binding precedent in determining whether the plaintiffs in this matter may proceed by way of a class action as they request.

That last task is what this Memorandum Decision addresses. The matter comes on for consideration on two motions within the above-captioned adversary proceeding (the "Adversary Proceeding"):

1.    Plaintiffs' Third Amended Motion to Certify Class and Motion to Appoint Class Representatives and Class Counsel [Adv. Dkt. No. 418][14] (the "Certification Motion") brought by the plaintiff Emelida Cordova and other joined plaintiffs (collectively, the "Plaintiffs") with respect to the Twelfth Amended and Class Action Complaint [Adv. Dkt. No. 410] (the "Complaint"); and

2.    The City of Chicago's Motion to Exclude Expert Testimony of Randall McCathren [Adv. Dkt. No. 461] (the "Motion to Exclude" and together with the Certification Motion, the "Motions").

The Motions each come with particular challenges under existing case law. These issues are discussed in detail below. For the reasons more fully discussed below, that relief sought by the Motion to Exclude Expert Testimony will be DENIED and that relief sought by the Complaint in

---

[9]    11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

[10]    *Hoffman*, 492 U.S. at 103.

[11]    11 U.S.C. § 106(a)(1).

[12]    *Katchen v. Landy*, 382 U.S. 323, 327 (1966) ("[Bankruptcy] courts are essentially courts of equity….") (quoting *Loc. Loan Co. v. Hunt*, 292 U.S. 234 (1934)); *In re Carlson*, 126 F.3d 915, 920 (7th Cir. 1997) (describing a bankruptcy court as a court of equity).

[13]    *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 333 (2017) ("[T]he separate systems of law and equity were merged in 1938 …."); *Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 142 (2016) (stating courts of law and equity were separate before 1938).

[14]    References to docket entries in the Adversary Proceeding will be denoted as "Adv. Dkt. No. ___."

the Certification Motion will be GRANTED, subject to the entry of a later order in compliance with the terms of Rule 23(c) of the Federal Rules of Civil Procedure.[15]

JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code. 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred has statutory authority to enter final judgment on any proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the bankruptcy court may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the bankruptcy court may hear the matters, but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1), (c). Absent consent, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, a bankruptcy judge must also have constitutional authority to hear and determine a matter. *Stern v. Marshall,* 564 U.S. 464 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy court hearing and determining the matter. *See, e.g., Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015) (parties may consent to a bankruptcy court's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough.")

As this court has written,

> [a]ll counts in the Complaint are based either on alleged violations of the automatic stay under section 362(a) or the turnover obligation under section 542(a). A request for sanctions for alleged violations of the automatic stay may only arise in a case under the Bankruptcy Code and, therefore, is a core proceeding and within the court's constitutional authority. 11 U.S.C. § 363(k); 28 U.S.C. § 157(b)(2)(O); *Gecker*

---

[15]    Herein, the "<u>Civil Rules</u>" and, as to each, "Rule ___". The Civil Rules are made applicable to this Adversary Proceeding by Rule 7023 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>" and, as to each, "Bankruptcy Rule ___"). The Federal Rules of Evidence, made applicable to this Adversary Proceeding by Bankruptcy Rule 9017, are herein referred to as the "<u>Rules of Evidence</u>" and, as to each, "FRE ___").

*v. Gierczyk (In re Glenn)*, 359 B.R. 200, 203 (Bankr. N.D. Ill. 2006) (Black, J.) ("[T]he cause of action for violating the automatic stay under section 362(k)(1) does not appear to have had a counterpart in eighteenth century England."). Likewise, an action for turnover under section 542 also arises only under the Bankruptcy Code, and therefore, is a core proceeding and within the court's constitutional authority. 11 U.S.C. § 542(a); 28 U.S.C. § 157(b)(2)(E); *see Boston Reg'l Med. Ctr., Inc. v. Reynolds (In re Boston Reg'l Med. Ctr.)*, 265 B.R. 645, 650 (Bankr. D. Mass. 2001). It follows that a motion to dismiss such actions is also a matter within the court's jurisdiction and constitutional authority. *Handler v. Moore (In re Moore)*, 620 B.R. 617, 625 (Bankr. N.D. Ill. 2020) (Barnes, J.). Further, no party has contested the jurisdiction or authority of this court in entering final orders in this matter.

*Cordova v. City of Chicago (In re Cordova)*, 635 B.R. 321, 330–31 (Bankr. N.D. Ill. 2021) (Barnes, J.). Despite the further amendments to the Complaint between that ruling and today, the same holds true here. Both of the Motions are procedural motions within a matter which is both a core proceeding and within the court's jurisdiction and constitutional authority.

Accordingly, the court has the jurisdiction, statutory authority and constitutional authority to hear and determine the Motions.

BACKGROUND

The Plaintiffs allege that they are residents of the City of Chicago (the "City") who each had their vehicles impounded by the City for unpaid vehicle infraction fines between January 1, 2013, and June 19, 2019.[16] They further allege that, after their vehicles were impounded, each Plaintiff commenced a case under chapter 13 of the Bankruptcy Code.[17]

As this court has written,

> This matter consists of a putative class action complaint against the City [of Chicago] regarding the refusal to release impounded cars to debtors in bankruptcy, acts that were recently before the Supreme Court in *City of Chicago v. Fulton*, 529 U.S. 154 (2021). In the Complaint, the Plaintiffs allege that the acts in question violate the automatic stay and turnover provisions in the Bankruptcy Code. They seek actual and punitive damages, attorneys' fees, costs of litigation, the value of the Plaintiffs' loss of property and any further relief and/or equitable sanctions as may be just and proper. The Plaintiffs seek to certify their claims as a class action.

*Cordova*, 635 B.R. at 328–29.

---

[16] The facts herein are drawn from the Complaint but also from the court's docket and papers filed in this case in order to produce a readable narrative. *See In re Prate*, Case No. 19bk9980, 2021 WL 5150156 at *2 n.2 (Bankr. N.D. Ill. Nov. 5, 2021) (Goldgar, J.).

[17] The Complaint is more complicated than it was when the court issued its ruling on dismissal in December of 2021. Then, the court concluded that "[t]he Complaint contains the same factual allegations for all joined Plaintiffs. Compl. at ¶¶ 6–59." *Cordova*, 635 B.R. at 331 n.2. The similarity of the factual allegations in the Complaint as it presently stands are discussed in more detail below in the context of Rules 23(a) & (b).

As the court has further stated:

> [U]pon commencement of their chapter 13 case[s], the Plaintiffs requested that the City deliver the Plaintiffs' vehicles to them. The City refused.

> The Plaintiffs allege, and the City does not dispute, that the City demanded an upfront lump sum amount, often over $1,000.00, and treatment of its claim in the Plaintiffs' plan[s] as fully secured in exchange for turnover of the vehicles. The Plaintiffs further allege that this amount bore no relation to the fair market value of the impounded vehicle, or its diminution of value as a result of passage of time. For those that could not afford to make the upfront payment, the City continued to retain the vehicles.

*Id.* at 331.

## PROCEDURAL POSTURE

A. The Complaint

The Complaint, as it presently exists, consists of four counts (the "<u>Counts</u>" and, as to each, a "<u>Count</u>"), summarized as follows:

- In Count I, the Plaintiffs request an order declaring that the City's conduct violated the turnover provisions of the Bankruptcy Code. *See, e.g.*, 11 U.S.C. § 542(a). They also seek an order of the court requiring the City to cease depriving chapter 13 debtors of their vehicles, awarding compensatory damages, awarding attorney's fees and awarding costs of litigation. Complaint, at ¶¶ 138–41.

- In Count II, the Plaintiffs request an order declaring that the City's conduct violated the automatic stay of acts to create, perfect or enforce a lien against property of a bankruptcy estate set forth in the Bankruptcy Code. *See, e.g.*, 11 U.S.C. § 362(a)(4). They also seek an order of the court requiring the City to cease depriving chapter 13 debtors of their vehicles, awarding compensatory damages, awarding attorney's fees and awarding costs of litigation. Complaint, at ¶¶ 142–45.

- In Count III, the Plaintiffs request an order declaring that the City's conduct violated the automatic stay of acts to collect, assess or recover any prepetition debt from the debtor. *See, e.g.*, 11 U.S.C. § 362(a)(6). They also seek an order of the court requiring the City to cease depriving chapter 13 debtors of their vehicles, awarding compensatory damages, awarding attorney's fees and awarding costs of litigation. Complaint, at ¶¶ 146–49.

- In Count IV, the Plaintiffs request an order declaring that the City's conduct violated the automatic stay of acts setting off debts owed to the debtor. *See, e.g.*, 11 U.S.C. § 362(a)(7). They also seek an order of the court requiring the City to cease depriving chapter 13 debtors of their vehicles, awarding compensatory damages, awarding attorney's fees and awarding costs of litigation. Complaint, at ¶¶ 150–53.

6

B.      The Certification Motion

1.      Pre-Briefing Discovery and the Class Representatives

The specific matter before the court arises out of the Certification Motion, filed in the above-captioned adversary proceeding on July 10, 2023.  As implied by its full title, the Certification Motion has been modified several times.  It was with respect to the earlier versions of the Certification Motion that the court ordered discovery, but that discovery applies herein as if ordered with respect to the most recent version.

In the Certification Motion, the Plaintiffs identify seven of the multitude of named Plaintiffs as potential class representatives.  These are Emelida Cordova, Tevida Nocentelli, Christopher Campbell, Brandon Brown, Ira Haymore, Breonca Hyles and Annie Williams (the "Proposed Class Representatives").  As noted above, Ira Haymore is presumably deceased and has been withdrawn as a Proposed Class Representative, though has not been removed as a Plaintiff in the Adversary Proceeding.

The naming of the Proposed Class Representatives was not without some controversy.

The original adversary proceeding, commenced on May 9, 2019, named ten Plaintiffs. Adversary Complaint for Actual and Punitive Damages for Violation of the Automatic Stay [Adv. Dkt. No. 1] (the "Original Complaint").  At that time the Plaintiffs did not seek class certification. Over the next two years, the Original Complaint was amended a number of times to add Plaintiffs, eventually reaching a total of fifty-six Plaintiffs.  On May 20, 2021, Plaintiffs for the first time sought class certification by filing its Ninth Amended Class Action Adversary Complaint for Actual and Punitive Damages for Violation of the Automatic Stay and Failure to Turnover Property [Adv. Dkt. No. 113] (the "Ninth Amended Complaint").  While a total of fifty-six Plaintiffs were joined, the Ninth Amended Complaint stated that only four Plaintiffs would bring the class action and seek certification on behalf of the class.  Those named Plaintiffs differed from the present Proposed Class Representatives, consisting of Emelida Cordova, Tony R. Jones, Joyce L. Johnson, Tevida B. Nocentelli.  Ninth Amended Complaint, at ¶¶ 72–83.  After the court granted in part and denied in part the City's request to dismiss the Ninth Amended Complaint, *Cordova*, 635 B.R. at 352–53 (granting leave to amend), the Plaintiffs subsequently filed their Tenth Amended Class Action Adversary Complaint for Actual and Punitive Damages for Violation of the Automatic Stay and Failure to Turnover Property [Adv. Dkt. No. 155] (the "Tenth Amended Complaint") on December 15, 2021, and a Motion to Certify a Class [Adv. Dkt. No. 150] on January 15, 2022.  The Tenth Amended Complaint continued to have fifty-six Plaintiffs, with four, self-selected Plaintiffs as the Proposed Class Representatives.

One of the main disputes between the parties regarding certification was whether the City could serve discovery on all fifty-six Plaintiffs who were not acting as Proposed Class Representatives, or whether it would be limited to only the four Proposed Class Representatives. On February 7, 2022, the City requested permission to commence discovery on every listed Plaintiff and not just on the four named as Proposed Class Representatives.  City's Motion for Leave to Depose and Send Interrogatories to Each Named Plaintiff and for Shortened Notice [Adv. Dkt. No. 174].  At a hearing on February 10, 2022, the Plaintiffs argued that the rest of the "non-class individual plaintiffs are treated as absent class members" and "[i]f class certification is granted, these

7

fifty-two non-class [P]laintiffs will be pulled into the class certification. There will be no need for discovery on consolidation or severing." Transcript of Judge Barnes' Hearing on February 10, 2022 [Adv. Dkt. No. 353], at pp. 12–13. During the hearing, the court stated it would allow discovery to begin on the four class Plaintiffs and reserve ruling on the question of the remaining Plaintiffs. *Id.* at p. 23. The court then set the issue of discovery and related briefing by the parties on additional Plaintiffs, to be heard on February 24, 2022.

On February 19, 2022, the Plaintiffs filed a motion listing ten Plaintiffs who consented to appear for deposition and who would respond to written discovery. Plaintiffs' Consent in Response to Defendant's Motion for Leave to Depose and Send Interrogatories to Each Named Plaintiff [Adv. Dkt. No. 196].

At the hearing on February 24, 2022,[18] relating to how many Plaintiffs could be deposed, the City stated its desire that each Plaintiff named in the Complaint be required to do what normal plaintiffs do, which is sit for and respond to discovery. Transcript of Judge Barnes' Hearing on February 24, 2022 [Adv. Dkt. No. 357] (the "Feb. 24 Transcript"), at p. 6. The court explained that the Plaintiffs cannot choose a subset of the captioned and pled Plaintiffs and name them the "so-called plaintiffs" because they are all named Plaintiffs and they are all subject to the City's inquiry. *Id.* at p. 6. The court deemed that ten is an appropriate number of plaintiffs and the Plaintiffs and City would each be able to each choose five who would be subject to discovery. *Id.* at pp. 13–15; Order Establishing Discovery Schedule [Adv. Dkt. No. 205] (the "Discovery Order"). Because the City had already served discovery on four of the named representatives, it was decided by the parties at the hearing that each would select two of the four previously named representatives and those selections would be included in the five Plaintiffs the parties were able to choose for discovery. Feb. 24 Transcript, at p. 13–15; see also Discovery Order.

That discovery ensued and was concluded on August 24, 2022. A few months after discovery ended, three out of the ten Plaintiffs that the City could subject to discovery were severed from the case. [Adv. Dkt. Nos. 349, 350 and 351]. Another plaintiff that the City was allowed discovery on failed to respond.

On December 16, 2022, the court granted Plaintiffs' Motion for Leave to File a Second Amended Motion to Certify Class and Motion to Appoint Class Representatives and Class Counsel [Adv. Dkt. No. 365] (the "Order Granting Leave to Amend"). The Order Granting Leave to Amend permitted the Plaintiffs to replace two of the original Proposed Class Representatives and to add a fifth one.

On February 6, 2023, an order was entered expanding certification-related discovery to a new class of plaintiffs recently added. Order Allowing Discovery Regarding the Claims of the "Scofflaw" Plaintiffs [Adv. Dkt. No. 388]. Discovery was set to close on June 23, 2023. On June 26, 2023, the court entered an Order Permitting Filing of Plaintiffs' Twelfth Amended and Class Action Complaint and Third Amended Motion to Certify [Adv. Dkt. No. 416] which allowed the Plaintiffs to file their third motion to add two new Proposed Class Representatives for a total of seven. Thereafter the Plaintiffs filed the Certification Motion.

---

[18]     On the same day, one of the plaintiffs was dismissed following his death, making the total number of Plaintiffs fifty-five. Order Dismissing Ronald B Williams as Plaintiff [Adv. Dkt. No. 202].

2.       The Certification Motion

In the Certification Motion, the Plaintiffs seek certification of a class of all persons who meet the following definition (the "Proposed Class"):

All persons whose motor vehicles were impounded by the City of Chicago under City of Chicago Municipal Code §§ 9-100-120 or 2-14-132, other than for a drug use-related offense, between January 1, 2013 and June 19, 2019, who filed a Chapter 13 bankruptcy case in the United States Bankruptcy Court for the Northern District of Illinois during the period of impoundment, who demanded the release of their vehicle after filing their petition for voluntary bankruptcy, and who were deprived by City of Chicago of the use or possession of their motor vehicle after the demand for release was made.

Certification Motion, at ¶ 5.

The Certification Motion asserts that the elements of Rule 23(a) have been satisfied, as follows:

- As to Rule 23(a)(1) for numerosity, Plaintiffs have identified 1,077 debtors who were denied turnover of their vehicles by the City after filing a chapter 13 bankruptcy and as such the putative class is so numerous as to render permissive joinder impracticable.  Certification Motion, at ¶ 10a.

- As to Rule 23(a)(2) for commonality, the Plaintiffs all share common question of law and fact in that, among other things, the City refused to release their impounded vehicles after they each filed a chapter 13 bankruptcy.  Certification Motion, at ¶ 10b. The Certification Motion also asserts that all class members suffered economic loss resulting from the temporary or permanent deprivation of the Plaintiffs' vehicles.  *Id.*

- As to Rule 23(a)(3) for typicality, the Plaintiffs' claims for temporary or permanent deprivation of their vehicles are typical in that they result from the same City procedure and their claims proceed on the same legal theory that the City's practice violated 11 U.S.C. §§ 362(a)(4), (6) & (7) and 542(a).  Certification Motion, at ¶ 10c.

- As to Rule 23(a)(4) for adequacy of representation, the Proposed Class Representatives' interests and claims are entirely consistent with those held by the proposed class they represent.  Certification Motion, at ¶ 10d.  The Proposed Class Representatives also understand and accept that they have a duty to protect the interests of other class members. *Id.*  Further, counsel for the Plaintiffs are both experienced litigators who have handled class action lawsuits.  *Id.*

The City, of course, objected.  City of Chicago's Objections to Plaintiffs' Third Amended Motion to Certify Class and Motion to Appoint Class Representatives and Class Counsel [Adv. Dkt. No. 419] (the "Certification Objection").  The Certification Objection is bare bones, purporting to reserve the right to file a more fulsome objection later.  Despite the impropriety of that approach,[19]

---

[19]     The court has unfortunately been required to repeatedly remind parties appearing before it that one cannot normally take several bites at the same apple.  Unless court-ordered, a reservation of "the right" to

the court ordered a briefing schedule which allowed the City to supplement its Certification Objection.  [Scheduling] Order [Adv. Dkt. No. 422] (the "Initial Scheduling Order").

On September 18, 2023, in accordance with the Initial Scheduling Order, the City filed the City of Chicago's Memorandum in Opposition to Plaintiffs' Third Amended Motion to Certify Class and Motion to Appoint Class Representatives and Class Counsel [Adv. Dkt. No. 426] (the "Memorandum").  On October 30, 2023, the Plaintiffs filed the Plaintiffs' Reply to Defendant's Response to the Third Amended Motion to Certify Class and Motion to Appoint Class Representatives and Class Counsel [Adv. Dkt. No. 427] (the "Reply").

This concluded the initial briefing on the Certification Motion.

### 3.   The Motion to Strike

Following the initial briefing, the City requested and received permission to file a motion to strike the Reply.  *See* Order Granting Leave for City of Chicago to File Motion to Strike Plaintiffs' Reply to Defendant's Response to the Third Amended Motion to Certify Class and Motion to Appoint Class Representatives and Class Counsel [Adv. Dkt. No. 431] (the "Second Scheduling Order").

On December 1, 2023, in accordance with the Second Scheduling Order, the City filed its motion to strike.  City of Chicago's Motion to Strike Plaintiffs' Reply in Support of Their Third Amended Motion to Certify Class [Adv. Dkt. No. 432] (the "Motion to Strike").  On December 22, 2023, the Plaintiffs responded.  Plaintiffs' Response to Defendant's Motion to Strike [Adv. Dkt. No. 434] (the "Strike Response").  On January 5, 2024, the City filed a reply.  City of Chicago's Reply in Support of Motion to Strike Plaintiffs' Reply in Support of Their Third Amended Motion to Certify Class [Adv. Dkt. No. 435] (the "Strike Reply").

The crux of the Motion to Strike is that the Plaintiffs, through their Reply, expanded the issues before the court on the Certification Motion instead of narrowing them.  The Plaintiffs attached over one thousand pages of new documents.  In essence, the Plaintiffs waited until their Reply to make many of the arguments essential to a finding in their favor on the Certification Motion.

On January 24, 2024, the court conducted a hearing on the Motion to Strike, the Strike Response and the Strike Reply.  In that hearing, the court heard argument that the Plaintiffs believed that that they could present their evidence in favor of certification at an evidentiary hearing and, as a

---

amend or supplement a filing, is ineffectual.  *In re World Mktg. Chicago, LLC*, 584 B.R. 737, 740 (Bankr. N.D. Ill. 2018) (Barnes, J.) (finding that responding to some but not all arguments with a reservation of rights to respond to others later constituted a waiver of other defenses, stating that "[r]eservations of rights in this context without court approval are meaningless.").  The Seventh Circuit has been very clear that even a court cannot confer a right through a reservation.  *Zerand-Bernal Grp., Inc. v. Cox*, 23 F.3d 159, 164 (7th Cir. 1994) ("A court cannot write its own jurisdictional ticket.").  A right must exist before it can be reserved.  Parties should be very cautious before trying what the City did here, or face the very real possibility that no further filing be permitted.  *World Mktg.*, 584 B.R. at 74; *see also In re Keebler*, 658 B.R. 908, 917 (Bankr. N.D. Ill. 2024) (Barnes, J.) (preceding to trial on some but not all counts of a complaint with an unvoiced presumption that the court will permit the plaintiff to pursue remaining counts later constituted an abandonment of those counts).

result, it was not until they read the Response that they realized their Certification Motion might fail in advance of such a hearing for failure to present the evidence in their filings. This belief underscores a problem that has run throughout these proceedings, that counsel to the Plaintiffs are not skilled in navigating these waters. Consider, for example, the way that the Plaintiffs approached joining multiple Plaintiffs and naming the Proposed Class Representatives discussed above. This is an issue that the court will return to below. Nonetheless, so as to not unduly prejudice the Plaintiffs with the failures of their counsel, the court granted the Motion to Strike in one limited part, allowing the City to file a sur-response to the Reply, but denied it in all other respects. Order Granting in Part Motion to Strike [Adv. Dkt. No. 438]. By their failures, counsel to the Plaintiffs lost the ability to have the last word on the pre-hearing briefing on the Certification Motion.

As a result, the City was afforded until February 26, 2024, to file the permitted sur-response. *Id*. On that date, the City filed its City of Chicago's Sur-Response in Support of its Opposition to Plaintiffs' Third Amended Motion to Certify Class and Motion to Appoint Class Representatives and Class Counsel [Adv. Dkt. No. 442] (the "Sur-Response").

> 4.      The Certification Hearing

On February 7, 2024, the court entered an order establishing an evidentiary hearing on the Certification Motion and procedures with respect thereto. Evidentiary Hearing Order [Adv. Dkt. No. 440] (the "Evidentiary Hearing Order"). The evidentiary hearing was conducted beginning on March 11, 2024, and concluding on March 13, 2024 (the "Certification Hearing"), at which hearing the court took evidence as to the criteria set forth in Civil Rule 23.[20]

In preparation for the Certification Hearing, the parties were ordered to participate in a joint prehearing conference, file a joint prehearing statement, file individual prehearing briefs and file lists of their respective witnesses and exhibits. Evidentiary Hearing Order. As a result, the parties submitted the following:

  a)    [Joint] Prehearing Statement [Adv. Dkt. No. 443] (the "Joint Statement");

  b)    Plaintiffs' Individual Prehearing Brief [Adv. Dkt. No. 446];

  c)    Plaintiffs' Witness List for the Certification Hearing [Adv. Dkt. No. 448];

  d)    Plaintiffs' Exhibit List for the Certification Hearing [Adv. Dkt. No. 449]; and

  e)    City of Chicago's Prehearing Brief [Adv. Dkt. No. 450].

---

[20]    Though no party arranged for a live court reporter for the Certification Hearing or arranged for a transcript to be included in the matter's docket, *see* Evidentiary Hearing Order at ¶ 8, at the court's request a transcript for the Certification Hearing (the "Transcript") was produced internally for the court and is relied on and cited to herein by the court. Citations to the Transcript herein are in format of "Tr., Mar. [11, 12 or 13], pp. [X–Y]".

11

In the Joint Statement, the City did not challenge the Plaintiffs' proposed expert Randall McCathren ("McCathren") as an expert for the Certification Hearing but did raise objections to the admissibility of the documents produced by McCathren.  Joint Statement, p. 15.[21]

At the Certification Hearing, the issues with respect to McCathren arose again.  At that time, the City orally objected to McCathren as an expert witness at the Certification Hearing.  The court provided the City a gating opportunity to ask McCathren questions, but only as to his credentialing as an expert.  After pursuing those inquiries, the City stated that it "does not object to this witness's credentials for purposes of this proceeding, but reserve[s] the right to raise those issues again if and when this case gets to the merits." Tr., Mar. 12, p. 126:14–20.  This resolved the issue of qualification, but the court permitted the City to reserve the right to raise issues as to the reliability of the data and how the methodology of McCathren is being applied to that data should the matter proceed to a case on the merits.  *Id.* at pp. 126:21–127:6.

As a result, the Plaintiffs were permitted to offer the testimony of McCathren as an expert witness in the Certification Hearing.  *Id.* at pp. 126:14–127:8.  During later, continued cross-examination of McCathren, the City attempted to renew its objection to McCathren's expert opinion as being unqualified.  *Id.* at p.157:17–21.  At that time, the court reserved ruling on the City's renewed objection, subject to hearing from Plaintiffs on redirect.  Following redirect, the court accepted the expert testimony for the limited purpose of certification but made no ruling as to McCathren's use as an expert in the matter should it proceed on the merits.  The court left it to the parties to make appropriate motions.  *Id.* at pp. 173:12–176:9.

At the conclusion of the Certification Hearing, the court granted the parties the ability to file post-hearing briefs/closing statements.  [Scheduling] Order [Adv. Dkt. No. 459].

5.      The Post-Hearing Briefing

Those briefs/closing statements were filed on March 3, 2024.  Plaintiffs' Closing Statement in Support of Class Certification [Adv. Dkt. No. 466] (the "Plaintiffs' Post-Hearing Brief"); City of Chicago's Post-Hearing Brief [Adv. Dkt. No. 467] (the "City's Post-Hearing Brief").

In the post-hearing briefing, the parties argue whether class certification is met. For the Plaintiffs, that was to say that all their previously submitted briefs and the evidence and argument presented at the Certification Hearing support certification of the Proposed Class.  As for the City, it argues that the evidence presented at the hearing does not meet the burden to certify the class.

The Plaintiffs' Post-Hearing Brief argues that the evidence from the Certification Hearing shows that the Rule 23 prerequisites of class certification are met.  First, the Plaintiffs argue that, not only did the City concede numerosity, but the evidence shows that there are hundreds or thousands of potential class members.  Next, the Plaintiffs discuss the City's practices and procedures concerning turnover of impounded vehicles.  The Plaintiffs' Post-Hearing Brief describes a practice by the City to claim a possessory lien attached to impounded vehicles, one that it memorialized by

---

[21]      The City also preserved objections with respect to McCathren's Declaration dated August 23, 2022, Plaintiffs' Exhibit List for the Certification Hearing, Ex. 68 (the "McCathren Declaration") and McCathren's initial report dated October 14, 2022, Plaintiffs' Exhibit List for the Certification Hearing, Ex. 67 (the "McCathren Report").

amending a section of the City of Chicago Municipal Code. The Plaintiffs describe a pattern by the City to only release chapter 13 debtors' impounded vehicles if they paid adequate protection and waived their rights to avoid or modify the City's lien.

They rely on the Proposed Class Representatives to highlight how their claims are common with and typical of the proposed class. In Cordova's case her vehicle was impounded by the City, she filed a chapter 13 bankruptcy case and then appeared at the address listed on her impoundment notice to ask for her vehicle back. Despite that demand, her vehicle was only released once her bankruptcy counsel filed a motion for turnover. Nocentelli's history was described as having her vehicle impounded, filing a chapter 13 bankruptcy case and demanding the release of her vehicle, but only receiving her vehicle back after paying the $1,250 demanded by the City. Campbell's history began with him filing a chapter 7 bankruptcy case after his car was impounded. When that case was dismissed, he filed a chapter 13 bankruptcy case and his attorney demanded the release of the vehicle. However, Campbell's vehicle was never returned to him. Both Brown and Hyles filed chapter 13 bankruptcy cases after their vehicles were impounded. Hyles demanded that the City release his vehicles but neither received their vehicles back. Brown is discussed further below. Finally, Williams filed multiple chapter 13 bankruptcy cases, attempting in each obtain her vehicle back. Despite the cases and multiple requests to the City, her vehicle was never returned. All Proposed Class Representatives agreed to limit their damages to the loss of their vehicle to allow for certification of a class. The Plaintiffs argue that commonality and typicality have been met due to the standardized policy and practice applied by the City to hundreds or thousands of chapter 13 debtors, including the Proposed Class Representatives.

The Plaintiffs' Post-Hearing Brief describes how the Proposed Class Representatives would fairly and adequately protect the interests of the Proposed Class because they have standing and understand the serious nature of their duties, evidenced by their willingness to reduce their damage claims to benefit the thousands of potential class members. As to the adequacy of counsel, they argue it was shown at the Certification Hearing.

Finally, the Plaintiffs argue that class certification is superior because it would more efficiently adjudicate the issue at hand and, if not granted, there would be thousands of chapter 13 debtors initiating individual adversary actions.

Conversely, the City's Post-Hearing Brief argues that the Plaintiffs, after continuous opportunities to put a case together, failed to show that their proposed class can be certified. For instance, there are individual questions about the Proposed Class Representatives' claims and the City's actions were not uniform but rather conducted on a case-by-case basis. The City argues that the Proposed Class Representatives each have unique case histories with different fact patterns and issues that cannot be used to represent the experience of one another. Rather, the City will defend each case separately.

First, the City takes issue with numerosity and argues it must be analyzed again due to the waiver of the Proposed Class Representatives to limit damages to either temporary or permanent deprivation of their vehicles.

Next, the City argues that the Proposed Class Representatives all present varying facts requiring the City to present different defenses as to each. For instance, it points to Brown, who agreed to surrender his vehicle in his chapter 13 plan, and argues that he never made a demand for

13

his vehicle. It argues that Williams, Hyles and Campbell only made in-person demands at a City office on Superior Street and not through their bankruptcy cases, which means their claims will fail. Cordova is another example the City points to because her vehicle was promptly returned and as such her claim will also fail. Therefore, inconsistent conduct means the burden for commonality and typicality are not met.

The City discusses the waiver of damages to say that the standards for commonality and typicality cannot be met because both Williams and Campbell testified that they would pursue other damages later. The waiver of damages also means that a class action is not superior because a plaintiff could achieve a greater damage award by initiating an individual action.

The City points to conflicts that should prevent adequate representation for the Proposed Class Representatives and the proposed class counsel. The Proposed Class Representatives have conflicts because they will need to respond to the separate defenses raised by the City and that they are split over who will and will not waive damages. As to the proposed class counsel, the City discusses how Ross Briggs was held in contempt of court by the United States Bankruptcy Court for the Eastern District of Missouri and was banned from representing new bankruptcy clients until his suspension ended in 2020. Further, the City takes issue with the Plaintiffs' counsel's limited class action experience. The City then points to the proposed class counsel's conduct in this case to argue that they lack an understanding of the class certification process and are learning Rule 23 procedures as they go, to the detriment of the City and the court.

Finally, the City takes issue with the Plaintiffs asserting a claim under section 542 because it is only enforceable through a court's inherent contempt powers and courts have held that a class action cannot be certified for contempt violations.

The court considers the arguments raised in each of the filings of the parties in relation to the Certification Motion, below.[22]

6.     The Motion to Exclude

In addition to the invited post-hearing briefing, the City also filed the Motion to Exclude. In the Motion to Exclude, the City seeks to exclude McCathren as an expert for the Plaintiffs, arguing that each of the methodologies offered by McCathren fail under the Federal Rules of Evidence and do not meet the standard set by the controlling case law.

As noted above, the City argues that the Evidentiary Hearing Order prevented it from filing pre-hearing motions, where it would have otherwise sought to exclude McCathren's testimony. The Evidentiary Hearing Order did that, but not in the manner the City states.

The Evidentiary Hearing Order states that "[s]eparate motions *in limine* shall not be filed. All objections to evidence will be addressed by the court at the pretrial conference …." Evidentiary Hearing Order, at ¶ 7. Instead, the Evidentiary Hearing Order expressly instructs the parties to

---

[22] The filings contain a veritable laundry list of issues, large and small. To the extent the court does not address specifically an argument made by either party, whether it be in relation to the Certification Motion or the Motion to Exclude, such argument was considered by the court but was not one which merited further discussion.

14

bring such objections in the Joint Prehearing Statement. *Id.* The Evidentiary Hearing Order, therefore, did not preclude objections but rather indicated the required procedures for bringing the same. The City followed those procedures and its objection was ultimately overruled with respect to the Certification Hearing.

Nonetheless, the City's Motion to Exclude raises issues that were not decided, such as the use of McCathren at a trial on the merits. As noted above, the court permitted the City to reserve on that issue subject to later briefing on the same.

The Plaintiffs, of course, responded to the Motion to Exclude. Plaintiffs' Response to the City of Chicago's Motion to Exclude Expert Testimony of Randall McCathren [Adv. Dkt. No. 464] (the "Plaintiffs' Exclusion Response"). The City has replied. Reply in Support of City of Chicago's Motion to Exclude Expert Testimony of Randall McCathren [Adv. Dkt. No. 468] (the "City's Exclusion Reply"). On May 15, 2024, after the filings were complete, the court conducted one final, post-Certification Hearing hearing where the parties were permitted to argue their positions on the Motion to Exclude.

At the conclusion of the post-Certification Hearing briefing, both the Certification Motion and the Motion to Exclude were taken under advisement. This Memorandum Decision constitutes the court's ruling on the matters under advisement, including each of the foregoing items on which the court has not previously ruled.

Though the foregoing items do not constitute an exhaustive list of the filings in the above-captioned adversary proceeding, the court has taken judicial notice of the contents of the docket in this matter. *See Levine v. Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 2011) (Goldgar, J.) (recognizing same).

APPLICABLE STANDARDS

A.      Turnover

This court has already written extensively on the nature of the claims in the Complaint. *Cordova*, 635 B.R. at 338–40. There, with respect to turnover, the court stated that:

> Section 542(a) provides, in pertinent part, that anyone who has "possession, custody, or control" of bankruptcy estate property must deliver that property to the trustee and "account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).
>
> "By its express terms, section 542(a) is self-executing, and does not require that the trustee take any action or commence a proceeding or obtain a court order to compel the turnover." 5 Collier on Bankruptcy ¶ 542.02 (16th ed.); *see also Fitzgerald v. United States (In re Larimer)*, 27 B.R. 514, 516 (Bankr. D. Idaho 1983).
>
> A trustee must prove three elements to successfully argue a turnover obligation, that (i) the property in question belongs to the estate, (ii) an entity had control or possession of the property during the pendency of the bankruptcy case, and (iii) that the property is not of inconsequential value or benefit to the estate.

15

*Paloian v. Dordevic* (*In re Dordevic*), Adv. No. 20ap00340, Case No. 20bk09807, 633 B.R. 553, 558–59 (Bankr. N.D. Ill. Sept. 22, 2021) (Cassling, J.) (citations omitted).

*Id.*

Further, though the court recognizes that the City contends otherwise and intends to contest this issue at a trial on the merits, the court in *Cordova* noted that section 542 is an automatic remedy. *Id.* at 340. The majority of the established case law also holds that section 542 is self-effectuating. *Mwangi v. Wells Fargo Bank, N.A.* (*In re Mwangi*), 432 B.R. 812, 823 (B.A.P. 9th Cir. 2010) ("It has long been the determination of this panel that the turnover provisions of the Bankruptcy Code are to be self-effectuating."); *Cornerstone Prods., Inc. v. Pilot Plastics, Inc.* (*In re Cornerstone Products, Inc.*), Case No. 05–53533, Adv. Case No. 05–4217, 2007 WL 4298745, at *12 (Bankr. E.D. Tex. Dec. 5, 2007) ("This affirmative obligation [under section 542(a)] is self-executing and does not require the holding of a hearing or the entry of an order by the bankruptcy court."); *accord North Am. Banking Co. v. Leonard* (*In re WEB2B Payment Sols., Inc.*), 488 B.R. 387, 393 (B.A.P. 8th Cir. 2013).

As early as 1891, the Supreme Court made abundantly clear that the use of "shall" in a statute confers a positive duty on the affected parties. *Cook Cnty. v. Calumet & C. Canal & Dock Co.*, 138 U.S. 635 (1891) ("The language, 'it shall be lawful for the said counties to convey,' did not leave a discretion resting with the county to hold the land or convey as it might think proper, but a positive duty was imposed to transfer such title as it acquired …."); *accord United States v. Cook*, 432 F.2d 1093, 1098 (7th Cir. 1970) ("While it is true in construction of statutes, and presumably also in the construction of federal rules, that the word 'may' as opposed to 'shall' is indicative of discretion or a choice between two or more alternatives, the context in which the word appears must be the controlling factor.").

Considering the context of section 542, the Seventh Circuit long ago held that a party cannot defeat the turnover requirements of section 542 by waiting for a demand which is made after the party has subverted by further transferring the property. *In re USA Diversified Prods., Inc.*, 100 F.3d 53, 56 (7th Cir. 1996). In *Diversified*, the Seventh Circuit made clear that notice of the bankruptcy case was enough to trigger responsibility under section 542. *Id.* at 56–58. The court sees no reason to revisit the Seventh Circuit's ruling on those matters here.

Nonetheless, this is not a determination on the merits of the dispute, except as may be needed to make the certification decisions. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *Simpson v. Dart*, 23 F.4th 706, 711 (7th Cir. 2022). Thus, the court finds in this matter that section 542 is self-effectuating solely for the purposes of making the determination herein today.

B.    Stay Violation

In *Cordova*, the court considered the elements of a stay action, stating that:

As noted above, commencement of a bankruptcy case gives rise to an automatic stay, 11 U.S.C. § 362(a), which, as the Seventh Circuit has stated, is a "powerful tool." *Fox Valley Const. Workers Fringe Ben. Funds v. Pride of the Fox Masonry & Expert Restorations*, 140 F.3d 661, 666 (7th Cir. 1998). That stay is set forth in section 362(a) in a series of subsections, which, in pertinent part, are as follows:

16

[A] petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of—

(4) any act to create, perfect, or enforce any lien against property of the estate;

...

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor;

....

11 U.S.C. §§ 362(a)(4), (6) & (7). As noted above, while the original complaint contained allegations under section 362(a)(3), after the Supreme Court in *Fulton* reversed in part the Seventh Circuit's ruling in *Thompson*, the Complaint was amended to omit that cause of action.

Often seen narrowly as a tool to protect debtors, the automatic stay is actually both that and a broader protection in favor of creditors. While the stay does provide debtors a necessary "breathing spell from ... creditors," H. Rep. No. 95-595, 95th Cong., at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6297, "creditors also benefit." *Wood v. U.S. Dep't of Hous. & Urban Dev. (In re Wood)*, 993 F.3d 245, 249 (4th Cir. 2021). "The stay preempts a 'race to the courthouse' and provides procedures for the fair allocation of the bankrupt's assets." *Id.* As such, the stay "preclude[s] one creditor from pursuing a remedy to the disadvantage of other creditors ...." *Fox Valley*, 140 F.3d at 666 (*quoting A.H. Robins Co. v. Piccinin (In re A.H. Robins Co.)*, 788 F.2d 994, 998 (4th Cir. 1986)).

So fundamental is this latter protection that both the Seventh Circuit and the Supreme Court have allowed to stand bankruptcy court orders extending the scope of the stay to nondebtor suits when allowing them to proceed might allow individual creditors to interfere with the bankruptcy's collective process. *See, e.g., Celotex Corp. v. Edwards*, 514 U.S. 300, 310 (1995) (quoting the bankruptcy court's determination that the failure to enjoin would result in a "carrion feast by the victors in a race to the courthouse." *In re Celotex Corp.*, 140 B.R. 912, 915 (Bankr. M.D. Fla. 1992)); *Fisher v. Apostolou*, 155 F.3d 876, 883 (7th Cir. 1998) (affirming a bankruptcy judge's decision to enjoin a lawsuit that might "derail the bankruptcy proceedings" with "a race to the courthouse."). Recently the Seventh Circuit affirmed the essential nature of the automatic stay by permitting bankruptcy courts to enjoin such third-party actions when appropriate to carry out the provisions of the Bankruptcy Code. *Caesars Ent. Operating Co., Inc. v. BOKF, N.A. (In re Caesars Ent. Operating Co., Inc.)*, 808 F.3d 1186, 1188 (7th Cir. 2015).

While each subsection under section 362(a) prohibits different kinds of acts, there are cases of clear overlap between the provisions. *Daff v. Good (In re Swintek)*, 906 F.3d 1100, 1104 (9th Cir. 2018). As such, a creditor action might violate multiple sections of the automatic stay. *See, e.g.*, *In re Oakhurst Lodge, Inc.*, 582 B.R. 784, 796 (Bankr. E.D. Cal. 2018) ("[A] single act can violate both the *in rem* rights of the estate and the *in personam* rights of the debtor.").

Such is the same with the Bankruptcy Code as a whole. Just because an action is addressed in one provision of the Bankruptcy Code does not mean that another might not apply. *Compare, e.g.*, 11 U.S.C. § 362(a)(4) (staying the creation and enforcement of liens in estate property postpetition) *with* 11 U.S.C. § 549(a) (allowing a trustee to avoid transfers or property of the estate occurring postpetition without court authority). Put another way, just because an invalid affixing of a lien might be avoided under section 549 does not mean the affixing isn't also a stay violation.

*Cordova*, 635 B.R. at 335–37.

As with section 542, section 362 is self-effectuating. The automatic stay is just that, automatic. No prior notice or demand is required for a creditor to be required to comply therewith. *Price v. United States (In re Price)*, 42 F.3d 1068, 1071 (7th Cir. 1994) (notice of the case is enough and intent to violate the stay is not required for a finding of willfulness under section 362(k)). As no notice or demand is needed, it is immaterial how a demand was made, if at all. If sections 362 and 542 were not self-effectuating, there would be little point to the Supreme Court's ruling in *Strumpf* carving out an exception to the same for freezing accounts. *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 21 (1995). The creditor in *Strumpf* could simply have sat back and waited, immune from any challenge until ordered to comply by the court.

In *Cordova*, the court considered each of the elements of the subsections of section 362(a) implicated by the Complaint. The court adopts that analysis as if fully set forth herein.

C.      Certification

Typically, "litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700–01 (1979)) (quotations omitted). A Class action presents an exception because it is "a lawsuit in which the court authorizes a single person or a small group of people to represent the interests of a larger group." *Anderson v. Weinert Enterprises, Inc.*, 986 F.3d 773, 776 (7th Cir. 2021) (quoting *Class Action*, BLACK'S LAW DICTIONARY (11th ed. 2019)) (quotations omitted).

Rule 23 governs class actions. Fed. R. Civ. P. 23. "A plaintiff seeking to certify a class must satisfy the four requirements of Rule 23(a)—numerosity, typicality, commonality, and adequacy of representation …." *Scott v. Dart*, 99 F.4th 1076, 1088 (7th Cir. 2024), *cert. denied,* Case No. 24-464, 2025 WL 581591 (Feb. 24, 2025) (citing *Orr v. Shicker*, 953 F.3d 490, 497 (7th Cir. 2020)). As such, Rule 23(a) serves to ensure the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. *Wal-Mart*, 564 U.S. at 349.

In deciding whether to certify a class, the court must take evidence and resolve any material factual disputes. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012); *Szabo v.*

18

*Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). In doing so, the court must perform a rigorous analysis to determine if the prerequisites of Rule 23(a) have been satisfied. *Wal-Mart*, 564 U.S. at 350–51. Only then will certification be proper. *Id.*

This is not to say that said rigorous analysis is one on the merits of the dispute. Class certification is an independent question from whether the underlying action may or may not succeed on its merits. *Simpson*, 23 F.4th at 711 (if the requirements of Rule 23 are met, "the class *must* be certified, even if it is sure to fail on the merits") (emphasis in original). As a result, courts are not required to make findings and any findings made would have to be considered preliminary in nature. *Bell PNC Bank, Nat. Ass'n*, 800 F.3d 360, 376–77 (7th Cir. 2015); *Messner*, 669 F.3d at 811; *Szabo*, 249 F.3d at 676. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466; *Simpson*, 23 F.4th at 711. As the Supreme Court has made clear, however, "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982); *Jacks v. DirectSat USA, LLC*, 118 F.4th 888, 896 (7th Cir. 2024).

Although the court should not rule on the merits when conducting a class certification analysis, it cannot merely take what the plaintiff asserts as the truth. *Messner*, 669 F.3d at 811. The plaintiffs must prove by a preponderance of the evidence that the requirements of Rule 23 have been met. *Bell*, 800 F.3d at 376 (citing *Messner*, 669 F.3d at 811).

In addition to Rule 23(a), a plaintiff must also establish that one of the categories in Rule 23(b) is satisfied. *Scott*, 99 F.4th at 1088. As such, the court will consider first the elements of Rule 23(a), then those of Rule 23(b).

1.    Rule 23(a)

Rule 23(a) has four required elements, as follows:

a.    Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). It acts as the first gatekeeping function for a class action, *Bell*, 800 F.3d at 373.

The key numerosity inquiry under Rule 23(a)(1) is not the number of class members but the practicability of joinder. *Anderson*, 986 F.3d at 777. Determining the practicability of joinder requires the court to evaluate "the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute." *Id.* (quoting 7A C. Wright & A. Miller, FEDERAL PRACTICE & PROCEDURE § 1762 (3d ed.)).

There is no bright-line rule as to how numerous a class must be in order to meet the numerosity standard. As the Seventh Circuit has observed, "[o]ur cases have recognized that 'a forty-member class is often regarded as sufficient to meet the numerosity requirement.'" *Id.* (citing to *Orr*, 953 F.3d at 498). But the Seventh Circuit has also cautioned that "a class of 40 or more does not guarantee numerosity." *Id.* The focus is instead on practicability of joinder. A movant must

19

"demonstrate that joinder is impracticable." *Williams v. Matteson Sports Bar*, 724 F. Supp. 3d 713, 718 (N.D. Ill. 2024).

### b.    Commonality

Rule 23(a)(2) requires there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).

The commonality requirement can be satisfied so long as the class shares a common nucleus of operative fact—a common question of law or fact. *See Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992); *Arenson v. Whitehall Convalescent & Nursing Home, Inc.*, 164 F.R.D. 659, 663 (N.D. Ill. 1996) (commonality requirement is satisfied if plaintiffs demonstrate that there is at least one common question of law or fact).

Generally, suffering a common violation of the same provision of law is not enough to meet the commonality requirement. *Wal-Mart*, 564 U.S. at 350. Plaintiffs must demonstrate that the class members have suffered the same injury from that violation. *Id.* at 350; *General Telephone*, 457 U.S. at 148.

> "What matters to class certification … is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."

*Wal-Mart*, 564 U.S. at 351 (quoting from Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). Thus, by examining all the class members' claims, there should be common answers to the common questions. *Id.* at 352.

Where the defendant engaged in the same conduct or practice giving rise to the claims of the class members, plaintiffs will be able to show common questions. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). While the theories of liability must be consistently measurable across the class, *Comcast Corp. v. Behrend*, 569 U.S. 27, 37 (2013), the need to quantify damages on a plaintiff-by-plaintiff basis does not necessarily prevent a finding of commonality. *Suchanek*, 764 F.3d at 756; *Arreola v. Godinez*, 546 F.3d 788, 801 (7th Cir. 2008). Put another way, while the variables may differ, the formula should be the same. The trial court "can devise solutions to address that problem if there are substantial common issues that outweigh the single variable of damages amounts." *Arreola*, 546 F.3d at 801; *Eagle v. Vee Pak, Inc.*, 343 F.R.D. 552, 579 (N.D. Ill. 2023).

### c.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Factual differences will not necessarily preclude typicality. Rather, the critical inquiry is "whether the named representative's claims have the same essential characteristics as those of the putative class." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).

If the court is required to make individualized determinations to establish a defendant's liability, typicality might be defeated. *Jones v. Takaki*, 38 F.3d 321, 323–24 (7th Cir. 1994) (fact-

20

specific balancing test for assessing alleged due process violations in Illinois drug asset civil forfeiture system barred typicality); *Graham v. Security Sav. & Loan*, 125 F.R.D. 687, 691 n.4 (N.D. Ind. 1989) (no typicality among students who sought rescission of student loans because claims were based on reliance on different oral representations); *Jeannides v. U.S. Home*, 114 F.R.D. 29, 30 (N.D. Ill. 1987) (typicality not satisfied in case alleging improper home construction because various individuals constructed homes and different plans and contracts were used).

The issue of liability, however, is not the same as the issue of damages.  Where the liability is typical, even if the damages vary, a class may be certified.  *Bruzek v. Husky Oil Operations Ltd.*, 520 F. Supp. 3d 1079, 1094 (W.D. Wis. 2021); *Endo v. Albertine*, Case No. 88 C 1815, 1995 WL 170030, at *4 (N.D. Ill. Apr. 7, 1995) ("The only real difference between the claims for the different types of securities is that any violation may have affected the damages each plaintiff suffered. The court concludes that these differences are insufficient to defeat either commonality or typicality of the class.").  *But see Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 881 (7th Cir. 2001) (finding that class denial was appropriate because of the costs of individual damages determinations).[23]

### d.  Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  The class representatives must be "part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 625–26 (internal quotations and citations omitted).  Further, "the court must be satisfied that the plaintiff will keep the interests of the entire class at the forefront." *Conrad v. Boiron, Inc.*, 869 F.3d 536, 539 (7th Cir. 2017).  "It is thus both necessary and proper for the district court to consider whether the potential named representative will act in the best interests of the unnamed members of the class." *Id.*; *see also Eagle*, 343 F.R.D. at 576 ("The rationale animating the adequacy requirement is to ensure that the named plaintiffs will vigorously advocate for a positive outcome for class claimants.").

Rule 23 does not, however, require that the interests of the class representatives and the class they seek to represent be identical, merely that the representation be adequate. *Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338, 1348 (7th Cir. 1990), *rev'd on other grounds,* 500 U.S. 90 (1991).

When a court is examining whether a conflict exists, as part of its rigorous analysis it must clearly define the classes and claims and "attach its arguments to specific elements of the claims …." *Santiago v. City of Chicago*, 19 F.4th 1010, 1019 (7th Cir. 2021).  Conflicts of interest can cause issue by requiring class representatives to choose between competing class members; however, conflicts can be resolved in some instances by creating subclasses and appointing new class representatives. *Id.* at 1018–19 (citing *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012)) (quotations omitted).

Adequacy problems are to be based on serious challenges because, as the court in *CE Design* reasoned, class actions should not be derailed by defendants "conjuring up trivial credibility

---

[23]  The lower court in *Aiello* appeared to improperly conflate failure to satisfy FRE 23(b)(3) with a failure to satisfy FRE 23(a)(3), but as the issues were narrowed and restated on appeal, the Seventh Circuit ultimately affirmed denial of class certification on this more general proposition.

problems or insubstantial defenses unique to the class representative. *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 728 (7th Cir. 2011). Rather, defendants must raise a serious challenge and "must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims." *Id.* at 728 (quoting *Dubin v. Miller*, 132 F.R.D. 269, 272 (D. Colo. 1990) (citations omitted)).

The Seventh Circuit has been clear that the possibility of class conflict materializing does not prevent class certification. *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 609–10 (7th Cir. 2021) (citing *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 813 (7th Cir. 2013)). "If and when [potential conflicts] become real, the district court can certify subclasses with separate representation of each." *Id.* at 609–10 (quoting *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 680 (7th Cir. 2009)).

One determination that needs to be made is whether a class representative is subject to a substantial defense unique to him. *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1027–28 (7th Cir. 2018) (citing *CE Design*, 637 F.3d at 728) ("A named representative might be inadequate if he is subject to a substantial defense unique to him."). Another factor to be considered is whether the named plaintiffs advocate for remedies that benefit the class and not only class counsel. *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752 (7th Cir. 2011) ("A representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interests.").

### 2.      Rule 23(b)

Rule 23(b) adds three additional criteria for class certification, only one of which must be satisfied for a class to be certifiable. *Wal-Mart*, 564 U.S. at 345. The District Court has held, however, that "in an action for damages, such as the present lawsuit, subsections (1) and (2) are not applicable." *Boshes v. Gen. Motors Corp.*, 59 F.R.D. 589, 599 (N.D. Ill. 1973) (citing to *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 564 (2d Cir. 1968); *Research Corp. v. Pfister Associated Growers, Inc.*, 301 F. Supp. 497 (N.D. Ill. 1969)).

Perhaps because of this, the Plaintiffs in this matter have retracted their original, broader request under Rule 23(b) and focused solely on Rule 23(b)(3).

Rule 23(b)(3) requires the plaintiff to show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Therefore, plaintiffs must show that both predominance and superiority exist. "Together, these requirements are intended 'to cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Melvin v. Sequencing, LLC*, 344 F.R.D. 231, 236 (N.D. Ill. 2023) (quoting *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 255 (N.D. Ill. 2014)).

The Rule includes a non-exhaustive list of "matters pertinent" to help a court's findings on these two requirements, including: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of

concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D).

### a. Predominance

The first part of Rule 23(b)(3) focuses on whether common questions predominate over individual ones. *Comcast*, 569 U.S. at 34 (citing *Amchem*, 521 U.S. at 615). The Seventh Circuit has previously explained the predominance requirement under Rule 23(b)(3), stating:

> Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of a case and ... can be resolved for all members of a class in a single adjudication. Or, to put it another way, common questions can predominate if a common nucleus of operative facts and issues underlies the claims brought by the proposed class. If, to make a *prima facie* showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a *prima facie* showing, then it becomes a common question. Individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole.

*Messner*, 669 F.3d at 815 (citations, brackets and internal quotation marks omitted).

### b. Superiority

The second part of Rule 23(b)(3) looks at "whether class action is a superior method of adjudicating the dispute." *Wal-Mart*, 564 U.S. at 362–63. "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Amchem*, 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (1997)). Further, as the District Court has pointed out, when causes of action redound on unsophisticated plaintiffs or in a way that individual plaintiffs might be disadvantaged in pursuing their rights individually, this factor is satisfied. *Ramirez v. Palisades Collection LLC*, 250 F.R.D. 366, 374 (N.D. Ill. 2008).

Courts also look at manageability when determining whether a class action is superior. *In re Steel Antitrust Litig.*, Case No. 08 C 5214, 2015 WL 5304629, at *12 (N.D. Ill. Sept. 9, 2015) (citing *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 65 (4th Cir. 1977), *cert. denied*, 435 U.S. 968 (1978)). "Courts should take a 'practical, on-the-ground assessment of whether the proposed efficiencies from a class action will outweigh the administrative problems and inefficiencies likely to ensue.'" *Id.* (quoting *Hamilton v. O'Connor Chevrolet, Inc.*, Case No. 02 C 1897, 2006 WL 1697171, at *13 (N.D. Ill. June 12, 2006)).

On the other hand, "[w]hen a class member has a sufficiently large stake in litigation to be able to afford to litigate on his own, this consideration weighs against allowing a suit to proceed as a class action." *Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450, 473 (N.D. Ill. 2009), *aff'd,* 675 F.3d 709 (7th Cir. 2012) (citations omitted). In *Puffer*, the Seventh Circuit did not find a class action to be superior

23

for gender discrimination claims because such claims are brought by countless individuals and the proposed class members in the case had "sufficient financial incentive to pursue claims individually." *Id.* at 473 (where the proposed class to bring the gender discrimination claims had salary ranges averaging between $83,489 to $391,833 and average W2 wages ranging from $95,399 to $807,450); *see also Beaton*, 907 F.3d at 1030 ("'[T]he amount of damages to which each plaintiff would be entitled is so small that no one would bring this suit without the option of a class.'").

By the same token, a class action may not be a superior method for litigating when a debtor bringing a claim under the Truth in Lending Act could "expect to receive over $50,000, plus attorney's fees and costs, in a recission action and that many debtors do in fact bring recission claims." *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 577 (7th Cir. 2008).

3.      Rule 23(g)

Determining the adequacy of representation does not stop at the class representatives, it also requires the court to examine the class counsel. Fed. R. Civ. P. 23(g)(1); *see also Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) ("If, therefore, the lawyer, through breach of his fiduciary obligations to the class . . . or otherwise, demonstrates that he is not an adequate representative of the interests of the class as a whole, realism requires that certification be denied."). Prior to 2003, many courts considered the adequacy of class counsel when determining the adequacy of class representatives. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) (citing *Sec'y of Lab. v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986) (stating that the adequacy of representation includes the adequacy of the named plaintiff's counsel)). In 2003, Rule 23 was updated to reflect that practice, requiring courts to specifically approve and appoint class counsel. *See* Fed. R. Civ. P. 23, Advisory Committee Notes to 2003 Amendment ("Subdivision (g) is new. It responds to the reality that the selection and activity of class counsel are often critically important to the successful handling of a class action.").

Rule 23(g) provides that "[w]hen one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4)." Fed. R. Civ. P. 23(g)(2). Rule 23(g)(4) describes the duty of class counsel which is that "[c]lass counsel must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). Fairly and adequately representing the interests of the class under Rule 23(g)(4) is not enough and in accordance with Rule 23(g)(1), the court must also consider "the factors set forth in Rule 23(g)(1)(A) and any other pertinent matters in accordance with Rule 23(g)(1)(B)." *Smith v. State Farm Mut. Auto Ins. Co.*, 301 F.R.D. 284, 288 (N.D. Ill. 2014); Fed. R. Civ. P. 23(g)(1). Rule 23(g) specifically lists four factors that the court must consider which are: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class …." Fed. R. Civ. P. 23(g)(1)(A).

In appointing class counsel, the court must therefore "consider counsel's work on the case to date, counsel's class action experience, counsel's knowledge of the applicable law, and the resources counsel will commit to the case." *Reliable Money Ord., Inc. v. McKnight Sales Co.*, 704 F.3d 489, 498 n.7 (7th Cir. 2013) (citing Fed. R. Civ. P. 23(g)(1)(B)). In addition to the mandatory considerations, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). A pertinent matter

would be counsel's misconduct or ethical breach. *Reliable*, 704 F.3d at 498 (citing *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011)). The misconduct must rise to the level of prejudicing the class or creating a direct conflict between counsel and the class. *Id.* Denial of class certification will be justified if the misconduct creates a serious doubt that counsel will represent the class loyally or has demonstrated a lack of integrity. *Creative Montessori*, 662 F.3d at 918 (citing *Culver*, 277 F.3d at 913).

        D.      Exclusion

As to the question of the propriety of an expert witness, the admissibility of expert testimony is controlled by FRE 702. Fed. R. Evid. 702. It states, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993) (quoting an earlier version of Fed. R. Evid. 702).

In *Daubert*, the Supreme Court interpreted FRE 702 to "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. Writing on this issue, this court has previously stated:

> In assessing the relevance of the expert's testimony, the court "must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). The court is not focused on the veracity of the opinion, but is instead restricted "to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Smith*, 215 F.3d at 719 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 159 (1999) (Scalia, J., concurring)). The court's primary inquiry should focus on the expert's principles and methodology rather than its ultimate conclusions. *Daubert*, 509 U.S. at 595. Specifically, the court should determine if the administered tests and the sources of information upon which the expert used and relied were appropriate—and not the "factual underpinnings" of the testimony. *Walker v. Soo Line R.R.*, 208 F.3d 581, 587 (7th Cir. 2000).

> Expert testimony must also be based on expertise, and not on "inferences from the record." [*Dana Corp. v. Am. Standard, Inc.*, 866 F. Supp. 1481, 1501 (N.D. Ind. 1994)]. Civil Rule 56(e) states that affidavits used in motions for summary judgment must "set forth facts" beyond evidence that is simply admissible; by implication, expert testimony should stem from a rational foundation. *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989). In other words, the expert opinion should "set forth facts" by using a reasonable and fact-based exposition, which is of greater importance to the court than the expert's ultimate conclusions. *Id.* The admission of expert testimony does not bind the factfinder to its contents, even if the opposing party does not present contrary evidence. *Dodge v. Stine*, 739 F.2d 1279, 1284 (7th Cir. 1984); *see also In re SSK Partners LLC*, Case No. 11bk49091, 2012 WL 4929019, at *6 (Bankr. N.D. Ill. Oct. 12, 2012) (Barnes, J.).

*In re World Mktg. Chicago, LLC*, 574 B.R. 670, 680–81 (Bankr. N.D. Ill. 2017) (Barnes, J.) (long cite substituted for short cite).

25

As a result, "[u]nder [FRE] 702 and [*Daubert*], expert testimony is admissible only if (1) the expert testifies to valid technical, scientific, or other specialized knowledge; and (2) that testimony will assist the trier of fact." *Messner*, 669 F.3d at 811–12 (citing *Daubert*, 509 U.S. at 579); *NutraSweet Co. v. X–L Eng'g Co.*, 227 F.3d 776, 787–88 (7th Cir. 2000)).

The Seventh Circuit has held that the Supreme Court in *Daubert* "impose[d] a gatekeeping responsibility on [trial] courts to ensure that any proposed expert testimony 'is not only relevant, but reliable.'" *Artis v. Santos*, 95 F.4th 518, 525 (7th Cir. 2024) (quoting *Daubert*, 509 U.S. at 589); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) (citations omitted).

There are four criteria set out in FRE 702 that govern the admission of expert testimony. Fed. R. Evid. 702. The witness must demonstrate to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

*Id.* For the sake of simplification, the factors can be collapsed into a consideration of qualifications, reliability and relevance.

### 1.      Qualifications

To determine whether an expert is qualified requires looking at more than whether they have extensive academic and practical expertise because their knowledge can be based on specialized experience. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). A person will not be qualified to give expert testimony, however, if there is "simply too great an analytical gap between the data and the opinion proffered." *Ortiz v. City of Chicago*, 656 F.3d 523, 536 (7th Cir. 2011) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

### 2.      Reliability

The reliability inquiry is a flexible one. *Brewster v. City of Los Angeles*, 672 F. Supp. 3d 872, 1006 (C.D. Cal. 2023)*; Moehrl v. Nat'l Ass'n of Realtors*, Case No. 19-CV-01610, 2023 WL 2683199, at *5 (N.D. Ill. Mar. 29, 2023). It requires ensuring "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Moehrl*, 2023 WL 2683199, at *5 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 152 (1999)). Expert testimony can be reliable even if it is founded on the witness's experience rather than on data. *Metavante*, 619 F.3d at 761.

The court must review "the soundness and care with which the expert arrived at her opinion …." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (citing *Daubert*, 509 U.S. at 595). Whether the expert's conclusions are correct is not the ultimate goal to be determined. *Id.* It is not enough for an expert witness to provide testimony that is based on subjective belief or speculation. *Metavante*, 619 F.3d at 761 (citing *Trs. of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Tr. Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787 (7th

26

Cir. 2007)).  Instead, the court's focus is solely on the principles and methodology used.  *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) (citing *Daubert*, 509 U.S. at 595).

When considering reliability, *Daubert* provided a non-exhaustive list of factors the court may look at: "(1) [W]hether the particular scientific theory can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community."  *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 873 (7th Cir. 2021) (internal quotations omitted) (clarifying the factors set forth in *Daubert*).  The list is neither exhaustive nor mandatory. *Gopalratnam*, 877 F.3d at 780 (citations omitted).  "Instead, 'a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability.'"  *Id.* (quoting *Kumho*, 526 U.S. at 141) (emphasis in original)).

3.      Relevance

When examining expert testimony or evidence, the court does not determine whether the testimony is correct, but rather "whether expert testimony is pertinent to an issue in the case …." *Smith*, 215 F.3d at 719 (citing *Kumho*, 526 U.S. at 159).  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1046 (N.D. Ill. 2022) (citing *Daubert*, 509 U.S. at 591).

In other words, this expert testimony must relate to the issue in the case to be relevant, and thus helpful.  *Daubert*, 509 U.S. at 591 (citing 3 J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE ¶ 702[03], pp. 702–36 to 702–18 (1988)).

Further, the expert's testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  The expert's testimony will satisfy the relevancy requirement "[w]here an expert's hypothetical explanation of the possible or probable causes of an event would aid the [the trier of fact] in its deliberations."  *Smith*, 215 F.3d at 718–19 (citing *Walker v. Soo Line R. Co.*, 208 F.3d 581, 589–90 (7th Cir. 2000)).  The hypothetical explanation must still "have 'analytically sound bases' so that they are more than mere 'speculation' by the expert."  *Smith*, 215 F.3d at 719 (quoting *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998)).

DISCUSSION

What is considered here must be taken up in light of a number of factors, not the least of which is the vulnerable economic condition of the putative class.  As noted above, it has been documented that the City's ticket and tow policies disproportionately affect its lower income residents.[24]  From those affected parties, some of which already reached a settlement with the City in a class action based on constitutional deprivation,[25] the putative class here is even further disadvantaged.  It consists of those whose economic condition was so dire that a bankruptcy case was necessitated.

---

[24]    *See, e.g.*, Sanchez & Kambhampati, *Chicago Ticket Debt.*

[25]    *Manuel Barrios et al. v. City of Chicago*, Case No. 15-cv-2648 (N.D. Ill. case commenced March 28, 2015)).

27

Before considering those issues, the court must consider several gating questions, including addressing a recent decision of this court in what might be considered a companion case to this one. *Jones v. City of Chicago (In re Jones)*, 657 B.R. 238 (Bankr. N.D. Ill. 2024) (Cox, C.J.). As a result, the court will first consider the issues raised in *Jones*, as well as two additional gating issues raised by the City. Following that, the court will consider the Motion to Exclude. Only once that is done, will the court consider the Certification Motion.

A.      Gating Issues

It should be noted that each of the gating issues raised by the City appear at one level or another to be challenges to the merits of the Plaintiffs' claims. Such challenges have their appropriate forums. In the court's view, this is not one of them. While it is true that a question as to whether sovereign immunity applies may be raised at any time, *United States v. U.S. Fidelity Co.,* 309 U.S. 506, 513 (1940), the inquiry before the court in taking up the Certification Motion is simply not one with respect to the merits of the Plaintiffs' claims. *Amgen*, 658 U.S. at 466; *Simpson*, 23 F.4th at 711.

Given, however, that each of the issues raised by the City is either misplaced or has been resolved previously, they are worth considering and rejecting here. First, however, the court will consider *Jones*.

1.      *In re Jones*

In *Jones*, Chief Judge Cox dismissed a putative class action by chapter 7 debtors with respect to what was, in large part, similar activity by the City. *Jones*, 657 B.R. at 245. Among the factors cited in *Jones* in favor of dismissal were the failure of the plaintiffs therein to reopen the underlying bankruptcy cases, concerns of judge shopping, standing and the efficacy of the various counts asserted in the action. *Id.* at 246.

As to reopening the underlying cases, while section 350 does state that a case may be reopened in order to accord relief to a debtor, 11 U.S.C. § 350(b), it does not state that this is the only method by which post closure relief can be granted. The Seventh Circuit has, in fact, reversed an earlier denial of relief sought post dismissal and post closure of case despite the movant not moving to reopen the case. *In re Sweports, Ltd.*, 777 F.3d 364, 368 (7th Cir. 2015). By so doing, the Seventh Circuit has treated the reopening of a bankruptcy case in much the same manner as the Supreme Court has treated the question of whether an adversary or motion is the proper device for seeking relief. *U.S. Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010) ("[T]he requirement that a bankruptcy court make this finding in an adversary proceeding derives from the Bankruptcy Rules, which are 'procedural rules adopted by the Court for the orderly transaction of its business' that are 'not jurisdictional.'") (internal citation omitted) (quoting *Kontrick v. Ryan*, 540 U.S. 443, 454 (2004)); *see also In re Butler*, 659 B.R. 301, 308 (N.D. Ill. 2024) ("The focus of the court with respect to the choice of procedure—whether contested matter or adversary proceeding—should simply be to ensure that due process is observed. As long as due process is observed, the procedural mechanism through which the relief is sought may be left to the party seeking the relief.") (citing *In re Ballard*, 502 B.R. 311, 324 n.14 (Bankr. S.D. Ohio 2013) ("The parties and court have the tools to appropriately manage the litigation once it is commenced regardless of whether it is commenced as an adversary proceeding or as a contested matter.")).

In this matter, the court has already ruled on and denied in part the City's motion to dismiss. *Cordova*, 635 B.R. at 352. Were the court convinced at this point that there existed an absolute, nonwaivable bar on these points and the case were infirm, it might revisit them here. But this is not a determination of the merits of the action, *Simpson*, 23 F.4th at 711, and while section 350 does state that a case *may* be reopened in order to accord relief to a debtor, 11 U.S.C. § 350(b), it does not state that this *must* occur for relief to be accorded or state that is the only method by which post closure relief can be granted.

Further, as will be considered in more detail below, the practicality of reopening individual chapter 13 cases in order to seek relief is a factor to be taken into account in determining whether the Rule 23(a) factors are met and need not be taken up as a gating question. If a recovery is obtained, reopening may be appropriate. It is premature to make that determination here and, as such, it is not a factor preventing certification.

With respect to the issues of standing and judge-shopping, the City has not made these arguments here and the court has no cause to raise those issues *sua sponte*.

Last, with respect to the efficacy of the various counts, the court reminds the City that it has already taken up some of these concerns in its ruling on the City's motion to dismiss. *See Cordova*, 635 B.R. at 330–31. It is not proper to relitigate decided issues in this manner. Further, as noted above, a ruling on Rule 23 is not a ruling on the efficacy of the underlying counts. *Simpson*, 23 F.4th at 711 (if the requirements of Rule 23 are met, "the class *must* be certified, even if it is sure to fail on the merits) (emphasis in original)). To the extent the court must consider the efficacy of the underlying counts in its Rule 23 analysis, it does so below.

2.      Sovereign Immunity

As noted, the City has raised several arguments that appear to be either attempts to relitigate the court's earlier ruling on its motion to dismiss or to raise indirectly matters that are better brought by such a motion. The first is sovereign immunity.

In this court's earlier ruling on the City's motion to dismiss, it took up the issue of sovereign immunity. As the court noted there and above, Congress abrogated state sovereign immunity in enacting section 106 of the Bankruptcy Code. *Cordova*, 635 B.R. at 329. The court there stated:

> Section 106(a) of the Bankruptcy Code is a valid exercise of congressional authority under the Bankruptcy Clause and the abrogation of State sovereign immunity and the terms and conditions regarding the same set forth in section 106 govern this matter. Section 106(a)(3) expressly excludes from abrogation punitive damages against a governmental unit, which the City unquestionably is. As a result, the City is immune from the Plaintiffs' punitive damages claim.

*Id.* While the Supreme Court in *dicta* in an early, nonbankruptcy case implied that the waiver of sovereign immunity under section 106 might be unconstitutional, *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 73 n.16 (1996), in later rulings the Court clarified that the opposite is true. *Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 357 (2006) ("[H]istory demonstrates that the power to enact bankruptcy legislation was understood to carry with it the power to subordinate state sovereignty ….").

Section 106 states that, "[n]otwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in . . . Sections . . . 362 . . . [and] . . . 542 . . . ." 11 U.S.C. § 106(a)(1). Section 106 goes on to clarify that "[t]he court may issue against a governmental unit an order, process or judgment . . . including an order or judgment awarding a money recovery, *but not including an award of punitive damages . . . .*" 11 U.S.C. § 106(a)(3) (emphasis added). Thus, when this court ruled on the City's motion to dismiss, it dismissed the Plaintiffs' request for punitive sanctions as outside of the scope of the waiver in section 106, while leaving the remaining Counts intact. *Cordova*, 635 B.R. at 345 ("Other than with respect to sovereign immunity and where Congress has specifically legislated an outcome, government entities should be treated no differently than any other creditor when they engage in commerce.").

Nothing has changed with respect to that conclusion, the City's arguments notwithstanding. The City is subject to this court's authority under section 542 (Count I) and section 362 (Counts II, III and IV).

3.      Remedies under Section 542

The City also challenges whether this court has the authority under section 542 to award damages from the City to the Plaintiffs. This is, in some respects, another disguised sovereign immunity challenge and fails for the same reasons. But it has other aspects as well.

The City argues that the Plaintiffs' claims under section 542(a) cannot be certified as a class action because compliance with obligations under section 542 is only enforceable through contempt. The City argues that a contempt action cannot be brought as an independent claim and cannot otherwise be certified on a class-wide basis.

While it is true that that the Seventh Circuit has stated that contempt actions are not freestanding, independent suits, *Alliance To End Repression v. City of Chicago*, 356 F.3d 767, 772 (7th Cir. 2004), the ruling in that case was limited to the question before the court then, whether contempt for violation of a consent decree in a class matter was in-and-of-itself a class claim. Nothing in *Alliance* stands for the proposition that the use of contempt power to rectify a class-wide failure to abide by a statute cannot be heard as a class action.

The City relies heavily on a Second Circuit opinion where the circuit disapproved a nationwide class arising out of class damages. *Bruce v. Citigroup Inc.*, 75 F.4th 297, 303 (2d Cir. 2023), *cert. denied,* 144 S. Ct. 565 (2024). But *Bruce* was unquestionably a contempt action—contempt of a discharge order. And it was nationwide, which the Second Circuit expressed concerns about. *Id.* at 303 ("Plaintiff fails to offer a single example of one court exercising its civil contempt authority on behalf of another court's injunction.").

Here, the Plaintiffs seek enforcement not of a court order, but a statute, and that is an entirely different set of circumstances. *Cf. D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 461 (7th Cir. 1993) (a court's continuing authority to enforce a settlement agreement does not convert a claim thereunder into "a court order enforceable only through a contempt proceeding"); *accord Blalock v. United States*, 844 F.2d 1546, 1550 (11th Cir. 1988) ("[C]ivil contempt is a device used to coerce compliance with an in personam order of the court which has been entered in a pending case.").

30

It is clear that, in the Bankruptcy Code itself, Congress considered that a court might sanction a party for failure to comply with section 542. Section 342(g)(2) of the Bankruptcy Code specifically addresses the notice required for penalizing a party for failure to comply with section 542, stating that:

> A monetary penalty may not be imposed on a creditor for a violation of a stay in effect under section 362(a) (including a monetary penalty imposed under section 362(k)) or for failure to comply with section 542 or 543 unless the conduct that is the basis of such violation or of such failure occurs after such creditor receives notice effective under this section of the order for relief.

11 U.S.C. § 342(g)(2). Congress clearly equated sections 542, 543 and 362 in this regard. It seems unlikely that Congress would draft into the Bankruptcy Code restrictions regarding monetary sanctions in anticipation that the court might extend its contempt authority to the statute, especially given Congress's nebulous authority to regulate a court's exercise of that inherent authority without an express indication of intent. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47–48 (1991) (discussing the circumstances in which Congress may regulate a court's inherent contempt authority). More likely is that Congress anticipated that the court would utilize the power granted to it by Congress under section 105(a) to remedy these situations. 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

True, some courts have used their inherent contempt power to enforce statutory violations in bankruptcy, *see, e.g., Paloian v. Grupo Serla S.A. de C.V.*, 433 B.R. 19, 41 (N.D. Ill. 2010) ("[A] bankruptcy court may punish a violation of the automatic stay pursuant to its civil contempt powers codified in § 105(a)."), but that does not convert an application of remedies under the express statutory authority granted by section 105 into one arising under the bankruptcy court's inherent contempt authority.

Though some courts have indeed held that section 105 affords bankruptcy courts civil contempt authority, *see, e.g., In re Schatz*, 122 B.R. 327, 328 (N.D. Ill. 1990); *Paloian*, 433 B.R. at 41, that is a red herring. Bankruptcy courts, as courts of the United States, already have that inherent authority. Of the Circuits, the Second Circuit has considered this issue most closely. In *Kalikow*, it wrote that

> "a court may invoke § 105(a) if the equitable remedy *utilized* is demonstrably necessary to preserve a right elsewhere provided in the Code...." *Bessette,* 230 F.3d at 444–45 (internal quotation marks omitted). These powers are "in addition to whatever inherent contempt powers the court may have" and "must include the award of monetary and other forms of relief to the extent such awards are necessary and appropriate to carry out the provisions of the Bankruptcy Code and provide full remedial relief." *Id.* at 445 (internal quotation marks and citations omitted).

*In re Kalikow*, 602 F.3d 82, 97 (2d Cir. 2010) (emphasis in original) (quoting *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 444 (1st Cir. 2000)).

Recently, the Second Circuit reiterated its holding in *Kalikow*, finding the argument that a bankruptcy court's contempt authority stemmed only from section 105 to be inconsistent with *Chambers. Worms v. Rozhkov (In re Markus)*, 78 F.4th 554, 563 (2d Cir. 2023). The exercise of

31

authority granted to the court by Congress to award damages for a statutory violation is not an exercise of the court's inherent contempt authority, but rather an exercise of the court's express statutory authority under section 105. *Kalikow*, 602 F.3d at 97. It is not outside of the court-imposed limitation on section 105(a) with respect to legislative gap-filling. *Kovacs v. United States*, 614 F.3d 666, 674 (7th Cir. 2010); *Cordova*, 635 B.R. at 341. Further distinguishing this matter from *Bruce*, even if these were orders (they are not), those orders would have arisen solely before this court. Plaintiffs seek a remedy only in the Northern District of Illinois.

Thus, the City is incorrect that the only enforcement mechanism for a section 542 violation is by way of contempt. The City also conveniently ignores the fact that this court has already ruled on issues nearly identical to this in a companion case. *In re Collum*, 649 B.R. 186, 195 (Bankr. N.D. Ill. 2023) (Barnes, J.).

In *Collum*, the City adopted a position that the matter before the court, parallel to this one in most respects, sounded only in contempt. In so doing, the City argued that the plaintiff therein had ignored the procedural requirements for such a contempt action. *Id.* The court rejected these contentions, concluding that the plaintiff in *Collum* was, without the need invoke contempt, capable of asserting his rights by way of an adversary proceeding to enforce the statutory violation of the provisions of the Bankruptcy Code using the authority given under section 105. *Id.* at 195-96; *see also In re Glenn*, 379 B.R. 760, 763 (Bankr. N.D. Ill. 2007) (Black, J.). That conclusion has been relied on by the District Court in ruling on an appeal of similar matters raised before another judge of this District. *Butler*, 659 B.R. at 308 (holding that the City's contentions "torture the language of the statutory provisions at issue").

Last, as noted above, this inquiry is one that is more to the merits of the Complaint than to the factors under Rule 23. It is, therefore, outside the scope of the court's consideration today. *Amgen*, 568 U.S. at 466; *Simpson*, 23 F.4th at 711.

Thus, while the court has expressly herein preserved the ability of the City to challenge at a later time whether section 542 is self-effectuating, this issue merits no further discussion. It is decided both as the law of this case and as to the law generally. These issues do not act as a bar to proceeding by way of class action.

B.    The Motion to Exclude

As part of the Certification Hearing, the Plaintiffs called McCathren as an expert witness on March 12, 2024. Tr., Mar. 12, pp. 112:7–14. McCathren was called by the Plaintiffs for the purpose of determining damages for the Proposed Class. In particular, McCathren was used to assist in the determination of damages of two distinct subclasses: Those Plaintiffs who had allegedly experienced permanent loss (where the car was presumably lost, sold or destroyed) and those who had experienced a temporary loss (where the car was eventually returned). *Id.* at pp. 114:11. In the Motion to Exclude, the City argued that McCathren's "opinion is neither expert opinion nor reliable" and, as to the second subclass, while McCathren seeks to use calculations by economists, he himself is not an economist.

The City first argues that McCathren's permanent deprivation method is not actually expert testimony as his use of Kelly Blue Book ("KBB") does not draw upon his special expertise. The City argues that McCathren will simply take the VIN number from each Plaintiff's car, input that

32

number into the KBB's online search functions and then read a report. That, the City argues, is "a proposed expert merely reading KBB reports" and "will not aid the factfinder in determining vehicle values because this can be established in other ways." The City further argues that this method is unreliable as certain key information is omitted, including the condition and mileage of the vehicles.

With respect to the temporary deprivation method, the City argues that that method is unreliable and McCathren is unqualified with respect to it. McCathren's temporary deprivation method will average the daily rental rate of three rental car companies around the two major Chicago airports, Chicago O'Hare International Airport and Chicago Midway International Airport. Tr., Mar. 12, p. 140:1–13. The City further argues that the temporary deprivation is unreliable because McCathren did not look to determine where the most competitive rental rates in Chicago were and did not look where the Plaintiffs lived to see where they might rent a vehicle. The City finally argues that the methodology is speculative, unreliable and inadmissible as, "[w]hen expert testimony is based on 'subjective belief or unsupported speculation,' that testimony is unreliable and inadmissible." *Marion Healthcare, LLC v. S. Illinois Healthcare*, Case No. 3:12-CV-871-MAB, 2020 WL 1527771, at *5 (S.D. Ill. Mar. 31, 2020), *aff'd*, 41 F.4th 787 (7th Cir. 2022) (citing *Daubert*, 509 U.S. at 590).

The City further states that McCathren is unqualified to provide the temporary deprivation method because he is not an economist. McCathren intends to use the Consumer Price Index from the United States Department of Labor (the "CPI") in his methodology because it is what economists use when seeking historical data. Tr., Mar. 12, p. 154:21–24. As McCathren is not an economist and the examination of him at the Confirmation Hearing did not establish him to be an expert in economics, the City believes McCathren is unqualified to provide his opinion on temporary deprivation.

In the Plaintiffs' Exclusion Response, Plaintiffs argue that McCathren's opinion testimony concerning class damages for permanent deprivation vehicles satisfies FRE 702 and *Daubert*. They state that, in order to satisfy *Daubert*, the data set relied upon by the expert "must merely have a rational connection to the opinion rendered …." *Manpower Inc., v. Ins. Co. of Pa.*, 732 F.3d 796, 809 (7th Cir. 2013). Further, the Plaintiffs note that ultimate determination of the persuasiveness of expert opinion must await the trial on the merits, *In re Suboxone Antitrust Litig.*, 421 F. Supp. 3d 12, 34 (E.D. Pa. 2019), *aff'd sub nom.*, 967 F.3d 264 (3d Cir. 2020); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994), and that the court is required to be flexible when using the *Daubert* factors with respect to reliability. *Brewster*, 672 F. Supp. 3d at 1006; *Moehrl*, 2023 WL 2683199, at *5.

Further with respect to permanent deprivation, the Plaintiffs argue that the KBB and its data source is reliable and used by the bankruptcy courts, including the Northern District of Illinois. *See, e.g.*, *In re Morales*, 387 B.R. 36, 37 (Bankr. C.D. Cal. 2008) (using the KBB but including vehicle mileage as a factor); *In re Stark*, 311 B.R. 750, 757 (Bankr. 2004) (Squires, J.) (same, but considering "mileage, features and accessories, and condition"); *see also* Order Imposing Sanctions and Awarding Compensatory Damages [Dkt. No. 29 in *In re Roldan*, Case No. 18-18593 (Bankr. N.D. Ill. Oct. 11, 2018) (Barnes, J.)] (the "*Roldan* Order") (awarding damages against the City in an amount based on the KBB value of vehicle).

The Plaintiffs also argue that McCathren testified that KBB provides a valuation based on the average mileage and condition. Tr., Mar. 12, pp. 160:24–161:10, 164:22–165:15, 170:6–13. Here, there was testimony that appeared to imply the KBB would balance out the differences, *i.e.*

that cars with high mileage or bad condition would be counterbalanced by those with low mileage or excellent condition. *Id.* at pp. 164:22–165:15 and 170:6–13. The Plaintiffs explain that what was meant was that the KBB averages were simply a starting point and that actual values and conditions would be factored in at trial. They state that such an exercise would be simplified by the City's own records, where the City inventoried vehicles when impounding them.

Last, the Plaintiffs state that individual differences in mileage and vehicle condition are not relevant to class certification. *Schroeder v. Progressive Paloverde Ins. Co.*, 713 F. Supp. 3d 523, 539–40 (S.D. Ind. 2024). Because the KBB range of values will be in an Excel spreadsheet, the Plaintiffs argue that the City can present evidence to rebut any proposed value that is too high. As a result, valuation of individual vehicles will be better managed in a collective process, and much more simply than thousands of separate damage trials if class damages are not certified.

As to temporary deprivation damages, the Plaintiffs argue that McCathren's temporary damages methodology is not untested or unaccepted as it has been used for decades by both federal and Illinois courts. The Plaintiffs cite to a number of cases in this regard. *Koninklijke Luchtvaart Maatschaapij, N.V. v. United Techs. Corp.*, 610 F.2d 1052, 1056 (2d Cir. 1979); *Brewster*, 672 F. Supp. 3d at 1006; *Quill, Inc. v. United States*, Case No. 20 CIV 2513 (AT), 2022 WL 4225542, at *3 (S.D.N.Y. Sept. 13, 2022); *Ferrari v. Cnty. Of Suffolk*, Case No. CV 10-4218 GRB, 2015 WL 3853489, at *5 (E.D.N.Y. Feb. 25, 2015); *Certain Underwriters of Lloyds', London v. Coastal Builders, Inc.*, Case No. CIV. A. 3:06-CV-92, 2007 WL 2826880, at *4 (S.D. Miss. Sept. 25, 2007); *In re Franklin*, 614 B.R. 534, 548 (Bankr. M.D.N.C. 2020); *Fairchild v. Keene*, 93 Ill. App. 3d 23, 23 (Ill. App. Ct. 1981). They argue that these cases demonstrate that cost of a rental replacement is the proper measure of damages for the temporary loss of a vehicle even where the vehicle owner is unable to secure or afford a rental vehicle in lieu of the absent vehicle.

Further with respect to temporary deprivation damages, the Plaintiffs argue that one need not be an economist to read and apply the rental data contained in the CPI. They claim the City presented no explanation or justification for the City's position in this regard.

As to McCathren's qualifications, Plaintiffs also claim that any such challenges have been waived as, instead of objecting, the City reserved the right to raise issues. Tr., Mar. 12, pp. 126:16–127:7.

As the court must weigh an expert's experience and education for a given area, *Smith*, 215 F.3d at 718, the Plaintiffs contend that the court, not the City, is the best determiner of McCathren's qualifications. They note that McCathren has real-world experience in economic matters; he holds degrees from Yale and Berkley where he studied engineering, applied science and law; he has worked in the auto leasing industry for forty-one years; and his partner of thirty-three years is an economist from whom he learned economics.

Last, the Plaintiffs argue that the only measure for admissibility of McCathren's opinions at the class certification stage is whether there exists a rational basis for his application of an accepted methodology. The admissibility of his opinion "does not turn on whether it is persuasive, is the best opinion available or even whether it is substantively correct—all matters to be left for trial on the merits." *Brewster*, 672 F. Supp. 3d at 956.

In the City's Exclusion Reply, the City argues that (a) there is no legitimate use of an expert to read KBB data and that McCathren has no understanding of the KBB numbers; (b) the proposed use of the KBB is incomplete, should not be used and the Plaintiffs did not establish McCathren's opinion as reliable; (c) McCathren's testimony cannot stand on its own, that they could not object prior to hearing and rather the court allowed the City to challenge McCathren as an expert; (d) McCathren's temporary deprivation method has only been used once before and was not put through the *Daubert* standard; (e) his method for calculating rental replacement fails under the requirements of FRE 702 and *Daubert*; and (f) it is the Plaintiffs' burden to establish by the preponderance of the evidence that the expert opinion is admissible, *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017), and the Plaintiffs improperly put the burden on the City by focusing on out-of-Circuit case law.  The City also reiterates, but adds nothing to, some of its earlier arguments.

### 1.      The *Daubert* Factors

As discussed above, in considering a motion to exclude expert testimony, the court is ordinarily guided by the *Daubert* factors.  Those factors are qualifications, reliability and relevance.

When the expert is offered at the certification stage in a putative class action, the Seventh Circuit has advised that in considering expert testimony at this stage, the court is required to do a full *Daubert* analysis of the proposed expert.  *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010) ("when an expert's report or testimony is critical to class certification, as it is here, … a [trial] court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion") (citation omitted); *Messner*, 669 F.3d at 812.  Whether the testimony is critical is determined broadly.  *Messner*, 669 F.3d at 811–12.  Ultimately, "[i]f a district court has doubts about whether an expert's opinions may be critical for a class certification decision, the court should make an explicit *Daubert* ruling." *Id.* at 812.

Here, a large part of the City's objections to McCathren stems from their argument that the issues on which McCathren will provide an opinion on are too simplistic, that an expert is not needed for the tasks that McCathren will engage in.  If true, the City all but admits that McCathren's opinions are not critical for a class certification decision.  If the matters are so simple that the court need no expert, the court can easily make the class certification decision without the expert's testimony.  As there is some doubt, however, the court will expressly consider the *Daubert* factors— McCathren's qualifications, reliability and relevance—each in turn and each in both the context of certification and the larger context of the case.

#### a.      Qualifications

The City waived the right to object to McCathren's qualifications as part of the consideration of the Certification Motion.  "Waiver is the intentional relinquishment of a known right." *Yang v. United States*, 114 F.4th 899, 910 (7th Cir. 2024), *cert. denied,* Case No. 24-704, 2025 WL 581665 (2025).  When the City allowed the Certification Hearing to proceed with the testimony of McCathren and expressly waived its objections related thereto, stating that it "does not object to this witness's credentials for purposes of this proceeding, but reserve[s] the right to raise those issues again if and when this case gets to the merits," Tr., Mar. 12, p. 126:14–20, it foreclosed its right to raise that issue again in the context of certification and no later objection or reservation may preserve what was then lost. *Zerand-Bernal Grp.*, 23 F.3d at 164 (discussed above).  Further, with

respect to the reraised qualification objection, the court overruled that objection at the Certification Hearing.  Tr., Mar. 12, pp. 173:12–176:9.

As a result, the court considers the City's qualification objection only as one which, if it is sustained, would prevent McCathren's testimony at trial on the Complaint.

McCathren is a consultant who has worked in the auto leasing and finance business since 1982.  Tr., Mar. 12, pp. 114:2; 116:21–16.  According to the McCathren Declaration and the McCathren Report, in addition to having a bachelor's in engineering from Yale University and a law degree from the University of California, Berkeley, McCathren has worked for the Federal Trade Commission and has led several organizations whose focus included either data gathering and processing or automobile financing, or both.  He has written a newsletter for twenty years dealing with the technical issues relating to auto financing and auto leasing,  *Id.* at p. 118:12–14, and published two books—one on bank leasing and the other on auto financing and auto leasing.  *Id.* at p. 118:21–23.

McCathren testified that a large part of his present job is valuing cars. *Id.* at p. 119:16–19.  While he normally does not predict the future value of cars; that is not a necessary valuation for the issue at hand.  *Id.* at p. 124:3–5.  Instead, McCathren values cars in real time, such as after a lease ends or the car is repossessed.  *Id.* at p. 124:12–13.  He explained that there are many instances when he must determine a car's valuation at a prior point in time, *Id.* at p. 125:1–11, such as when a claim comes in, but the car was sold earlier.  *Id.* at p. 125:7–11.

True, McCathren is not an economist.  But the City's insistence that he must be an economist to assist the court is mistaken.  McCathren brings with him real world, directly relevant experience.  While his potential use in the matter may be problematic, that does not change the fact that his qualifications are on point and extensive.  His practical and specialized expertise, *Smith*, 215 F.3d at 718, both meet the applicable standards.  Further, McCathren testified that he was partnered with an economist who could be tasked on any matter that required that expertise.  Tr., Mar. 12, p. 155:1–8.

Is there too great an analytical gap between the data and the opinion proffered?  *See Ortiz*, 656 F.3d at 536.  The court does not see that as being the case.  While McCathren mostly has focused on valuations in the present day, his testimony was convincing on the fact that the methodologies are either the same or substantially the same for older cars.  Tr., Mar. 12, pp. 119:16–122:11 and p. 125:1–126:4.

Further, the court places great import on the fact that McCathren has filled precisely the role proposed here in a matter before the United States District Court for the Northern District of Illinois.  *See* McCathren Report, at p. 13 (citing to *Manuel Barrios et al. v. City of Chicago*, Case No. 15-cv-2648 (N.D. Ill. case commenced March 28, 2015)).  The court takes judicial notice of the contents of the *Barrios* docket and, in so doing, notes that in the context of an agreed class certification and settlement, McCathren's methodology for both permanent deprivation and temporary deprivation was the same as it is here.  *See* Plaintiffs' Memorandum of Law in Support of Their Uncontested Motion for Final Approval of Class Action Settlement, Certification of a Settlement Class, and for Other Relief [Adv. Dkt. No. 184 in *Barrios*], pp. 5–7.  That methodology was implicitly approved by Judge Gottschall when she entered her Final Judgment and Order [Adv. Dkt. No. 187 in *Barrios*].  McCathren also testified that he had produced other such valuations in the

past. Tr., Mar. 12, pp. 125:23–126:4. While the City argues that McCathren's testimony was not put to a Daubert test in *Barrios*, the fact remains that the District Court had the power to reject the settlement if it had concerns with the same but did not do so.

As a result, McCathren meets the precedential requirements, and the court therefore finds that McCathren's qualifications meet the standards under Federal Rule of Evidence 702.

b.      Reliability

As noted above, the reliability inquiry is a flexible one. *Brewster*, 672 F. Supp. 3d at 1006; *Moehrl*, 2023 WL 2683199, at *5. It requires ensuring that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

It is difficult to determine McCathren's reliability independent of the relevance inquiry. The court has been given no reason to doubt that McCathren would employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. His testimony was clear and on point and relies in part for its rigor on an accepted industry standard, the KBB. *See, e.g.*, *Thompson v. Progressive Universal Ins. Co.*, Case No. 19-CV-150-WMC, 2021 WL 9474269, at *2 (W.D. Wis. Jan. 5, 2021) (affirming on appeal a bankruptcy court's reliance on Edmunds True Market Value pricing system but noting in so doing that numerous courts rely on and take judicial notice of KBB valuations) (citing to numerous cases, including *10ITT Commercial Fin. Corp. v. Unlimited Auto., Inc.*, 814 F. Supp. 664, 668 (N.D. Ill. 1992) ("This court, however, takes judicial notice that Kelley's Blue Book is an authoritative guide to the valuation of recreational vehicles.")); *see also Stark*, 311 B.R. at 757; *Roldan* Order; Fed. R. Evid. 703.

It is clear to the court that the Plaintiffs' proposed use of McCathren does not call for the employment of intellectual rigor beyond his capabilities and that his expertise is relevant to each of the methodologies proposed by the Plaintiffs. The court therefore concludes that McCathren's proposed use meets the reliability standards in applicable law and under Federal Rule of Evidence 702.

c.      Relevance

As noted above, the relevance requirement does not look at whether the expert's testimony is correct. Instead, the court must determine whether the expert's testimony relates to the issue in the case and will help the trier of fact in its decision.

McCathren provided the court an explanation for how he would calculate damage awards for plaintiffs whose cars were permanently deprived by the City. He testified that he would provide a list of the VIN for each Plaintiff's car and, from it, inquire into the KBB's electronic database, adding to that inquiry the date of deprivation and geographic area. Tr., Mar. 12, pp. 136:6–137:14. The result of that inquiry would be an Excel file providing the value for each car. *Id.* In attempting this methodology prior to this case, McCathren explained that he did not do anything else with the data. He simply added up the numbers. *Id.* To be clear, McCathren did not rule out the inclusion of other data, but as initially proposed, his contribution would be to compile the data, submit and receive the report. *Id.* at p. 144:11–22.

37

As to additional data, McCathren testified that that could be added, but it would have to be done on a case-by-case basis. *Id.* at pp. 148:16–149:3. Such additional data might include individual characteristics of each car, such as the mileage or wear and tear. *Id.* at pp. 145:23–149:3.

In the absence of additional data, McCathren testified that the values obtained by using KBB would "average out" individual differences in the cars. *Id.* at pp. 160:24–161:10. He testified that by taking the sales characteristics of all cars that KBB has sales records of, the result will be an average of all other variables that were not accounted for by the VIN numbers he provides to KBB. *Id.* at p. 164:22–165:15. When looking at 2,000 cars (which could be the case here), McCathren explained there would statistically be a "pretty narrow bell-shaped curve" for the value. *Id.* at p. 160:3–9.

For plaintiffs that were only temporarily deprived of their vehicles, McCathren begins with the date that the loss originally occurred and the number of days that the deprivation continued. *Id.* at pp. 137:21–138:12. To that, he applies the average rental cost for a similar car to determine the daily rate. *Id.* Multiplying the days of deprivation by the average rental cost for a similar car yields the deprivation damages. *Id.*

As for the source of the average rental car, McCathren testified that he could not locate any companies with large databases that tracked the historic rental rate for individual types of cars. *Id.* at p. 138:13–16. Instead, the CPI includes a rental car price index that McCathren testified can be used to show the differences as a percentage between the rental car cost from one month to another or one year to another. *Id.* at pp. 138:13–139:1. McCathren testified that he would use the CPI as a national metric as there were no localized databases related to rental rates. *Id.* at pp. 154:8–20.

McCathren therefore proposes to determine the rental car cost for the type of rental in Chicago today, look at the CPI for the car rental today, and compare it to the CPI at the time of the temporary deprivation. *Id.* at p. 139:2–9. He proposes to look at two major car rental areas as they would have the highest volume of rentals and, he believes, would have rates slightly discounted from other areas due to competition. *Id.* at p. 140:1–8. McCathren testified that the two largest car rental areas would be around O'Hare and Midway. *Id.* While he believes there would be twelve different rental car companies trying to get clients and providing the best rates, he explains he would average the cost of renting from three of the biggest rental car companies in the two major rental car areas. *Id.* As he stated during direct examination, his proposed methodology would be to average "the cost of at least three of the biggest rental car companies in those two areas for that specific car." *Id.* at p. 140:9–13. McCathren testified that he did not look to determine where the least expensive or most competitive rates were in the City of Chicago. *Id.* at p. 152:21–24. Nor did he look at where the plaintiffs were located in order to localize the rates to their zip codes. *Id.* at p. 153:1–4.

The court finds little to take issue with in McCathren's overall approach. His use of the KBB as a data source for permanent deprivation damages and the CPI to adjust for rental car rates for temporary deprivation are both sound and reliable. The City is correct that the individual data points need refining, however. Inclusion of mileage and condition in the permanent deprivation calculation is both a refinement that can take place prior to trial and, as the Plaintiffs argue, data over which the City will have a right to be heard at the appropriate time and place.

McCathren's temporary deprivation methodology is in need of further refinement, to be clear. McCathren's assumptions based on rental rates do not appear to be backed by evidence, and anecdotal evidence leads the court to question them (*e.g.*, are larger rental car agencies more or less

38

expensive?; are rental rates more or less expensive at or near airports?). While the court believes that McCathren can use his expertise to refine this methodology based on actual, hard data, he has not done so yet. Nor has he had to. This is not a trial on the merits. He may use that expertise to derive an opinion based on appropriate facts or data, even if the facts and data themselves are not admissible. Fed. R. Evid. 703. If he does so, the City would be free to cross-examine McCathren on his opinions and assumptions at trial. *See, e.g.*, *Gomez v. City of Chicago*, Case No. 13 C 05303, 2015 WL 13651138, at *2 (N.D. Ill. June 29, 2015). Until that is done, however, the assumptions in his temporary deprivation methodology are just that, assumptions.

2.    Conclusion

What then, should be the result? As noted above, "when an expert's report or testimony is critical to class certification, as it is here, … a [trial] court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." *Am. Honda*, 600 F.3d at 815–16 (citation omitted). *American Honda* and the Seventh Circuit cases on which it relies arises in the context of competing methodologies and competing experts, something that is not at issue here. Further, a plaintiff cannot be required to litigate its case in chief as part of either a *Daubert* consideration or a Rule 23 analysis. That would put paid to the relative order required in our legal system. There has to be room for a plaintiff to further refine and expound its methodology prior to actually going to trial on the merits.

If a lack in McCathren's testimony regarding the specific calculation of temporary deprivation damages is fatal to determining predominance, then certification *must* be denied. *Id.* But, to be clear, the City has failed to show how McCathren's testimony regarding the specific calculation of damages for temporary deprivation is critical to class certification.

The City challenges McCathren's credentials and experience and takes issue with aspects of McCathren's methodology, especially those which the City believes fall outside his credentials and experience. As to credentials and experience, the court has already found that McCathren meets the applicable standards. While the City takes issue with the fact that McCathren proposes to use the CPI but is not an economist, one need not be an economist to derive information from the CPI. *Indiana GRQ, LLC v. Am. Guarantee & Liab. Ins. Co.*, Case No. 3:21-CV-227 DRL, 2024 WL 1231260, at *19 (N.D. Ind. Mar. 22, 2024), *appeal dismissed,* Case No. 24-1637, 2024 WL 4578992 (7th Cir. Sept. 17, 2024) (accepting an environmental health engineer's testimony regarding inflation from the CPI, stating that "no one needs an economist, actuary, or other expert to assess inflation reasonably, particularly for these sophisticated parties."); *see also Sunstar, Inc. v. Alberto-Culver Co.*, Case No. 01 C 5825, 2006 WL 6505615, at *8 (N.D. Ill. Nov. 16, 2006) (accepting expert testimony based on the CPI from an accountant). McCathren's qualifications and credentials are more than sufficient to undertake this task.

As to methodology, McCathren's overall methodology is sound and falls within FRE 702, FRE 703 and applicable precedent. While both the City and the court have identified assumptions in McCathren's temporary deprivation methodology that may warrant further refinement, the City is free to cross examine McCathren on those very issues at trial. Further, the very same methodology as the City challenges here was not rejected by the District Court in *Barrios*.

While there may remain issues with McCathren's data that will need to be refined, FRE "702 … does not condition admissibility on ... a complete and flaw-free set of data." *Lees v. Carthage*

39

*Coll.*, 714 F.3d 516, 524–25 (7th Cir. 2013) (internal citations omitted); *Dealer Mgmt.*, 581 F. Supp. 3d at 1089.  Further, as noted above, the need to quantify damages on a plaintiff-by-plaintiff basis does not necessarily prevent a finding of commonality.  *Suchanek*, 764 F.3d at 756; *Arreola*, 546 F.3d at 801.  As the Seventh Circuit has stated, the trial court "can devise solutions to address that problem if there are substantial common issues that outweigh the single variable of damages amounts." *Arreola*, 546 F.3d at 801; *Eagle*, 343 F.R.D. at 579.

Given the conclusions above and with respect to certification below, the court finds that leaving the specific damages calculations to be refined prior to trial and preserving the City's rights in that regard does not offend *American Honda*.  Certification does not turn on the challenged aspects of McCathren's data/methodology and *Daubert* does not require the exclusion of McCathren's testimony for the reasons argued by the City.

As a result, the Motion to Exclude is denied, without prejudice to the City's right to object to McCathren's data and cross-examine him on his methodology at trial.

C.      The Certification Motion

The arguments of the Certification Motion are discussed above.  In response, in the Memorandum, the City argues that: (i) the Plaintiffs fail to meet their burdens to show by evidence that they are entitled to class certification; (ii) the City itself has evidence to show that that Plaintiffs cannot meet the requirements of Rule 23(b)(3); (iii) the Proposed Class fails because Plaintiffs seek monetary damages and an injunction that duplicates injunctions in the Bankruptcy Code; and (iv) that the court should take into account any applicable statute of limitations and limit the Proposed Class accordingly.

In the Reply, the Plaintiffs counter each of the City's arguments above, except the statute of limitations one.  While the court discusses each of the certification arguments below, the question of statute of limitations is best addressed here.

In *Collum*, the court considered the City's argument in a motion to dismiss that the matter should be dismissed for statute of limitations reasons.  *Collum*, 649 B.R. at 194.  There, the court observed that in federal matters, a statute of limitations defense is an affirmative defense and does not normally give rise to grounds to dismiss a case.  *Id.* ("This is because 'a plaintiff is not required to plead facts in the complaint to anticipate and defeat affirmative defenses.'") (quoting *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012)).

Here, the City makes nuanced arguments regarding which statute of limitations might apply and why.  Nothing about those arguments leads the court to conclude that a statute of limitations determination is unambiguous.  *See Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (granting motion to dismiss based on statute of limitations defense where the issue was unambiguously set forth in the complaint).  As an affirmative defense is one to be considered at the merits stage, absent that clarity, any determination at this stage is premature.  *Simpson*, 23 F.4th at 711.

As the court noted in *Collum*, "the City seeks to step ahead of the affirmative defense process by raising the issue of statutes of limitations at the motion to dismiss stage." *Collum*, 649 B.R. at 194. The same is the case here.  The court may certify the Proposed Class as proposed without considering the nuanced issues of statutes of limitations, an issue not fully briefed and therefore not

before the court today.  Any subsequent narrowing of the class due to successfully asserted affirmative defenses can occur at a later date.

### 1.     The Standards Revisited

Considering now the Certification Motion, the court must consider whether the requirements of Rule 23(a) and the applicable case law have been met.

As noted above, Rule 23 governs class actions.  Fed. R. Civ. P. 23.  "A plaintiff seeking to certify a class must satisfy the four requirements of Rule 23(a)—numerosity, typicality, commonality, and adequacy of representation …."  *Scott*, 99 F.4th at 1088.

Rather than ruling on the merits, *Simpson*, 23 F.4th at 711 (if the requirements of Rule 23 are met, "the class *must* be certified, even if it is sure to fail on the merits") (emphasis in original), a ruling under Rule 23 answers the question of whether the matter should proceed as a class and whether the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate.  *Wal-Mart*, 564 U.S. at 349.  Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen*, 568 U.S. at 466; *Simpson*, 23 F.4th at 711.

Here the court notes that there is no need in the instant matter to make findings other than those of a preliminary nature.  *Bell*, 800 F.3d at 376.  The court does not take what the Plaintiffs assert as the truth but rather considers whether such assertions on their face appear to meet or exceed, by the preponderance of the evidence standard, the requirements of Rule 23.  *Id.* at 376; *Messner*, 669 F.3d at 811.

### 2.     Rule 23(a)

#### a.     Numerosity

The question of numerosity need not be taken up by the court with any rigor, as the City does not contest this element.  Sur-Response, at n.13 ("The City is not contesting numerosity under Rule 23(a)(1).").

Nonetheless, the court notes that the Complaint alleges that there exist over 1,000 potential class members.  Complaint, at ¶ 130.  Considering the number of chapter 13 cases in the Northern District of Illinois, one of the highest volumes in the United States, and the prevalence of the City's towing activities, *see* Final Judgment and Order [Dkt. No. 187 in *Barrios*] (certifying a class of over 400 plaintiffs affected by the City's towing policies in a two-year period, as opposed to the six and one-half year period applicable here), the court finds this number to be plausible and that joinder is implausible.

The Plaintiffs have established the numerosity requirement of Rule 23(a) by a preponderance of the evidence.  *Anderson*, 986 F.3d at 777; *Williams*, 724 F. Supp. 3d at 718.

#### b.     Commonality

As noted above, Rule 23(a)(2) requires there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The commonality requirement is satisfied if plaintiffs demonstrate

41

that there is at least one common question of law or fact. *Rosario*, 963 F.2d at 1018; *Arenson*, 164 F.R.D. at 663.

It is clear to the court that the Complaint sufficiently alleges common questions of law and fact. The common law is self-evident, the alleged violation of sections 362 and 542 of the Bankruptcy Code. All Proposed Class Representatives and all Proposed Class members share this legal theory in common. All Proposed Class Representatives and all Proposed Class members were in active chapter 13 cases at the time of the alleged injuries. Complaint, at ¶¶ 52–53, 129. The City has allegedly engaged in the same conduct or practice giving rise to the claims of the Proposed Class members. *Suchanek*, 764 F.3d at 756.

As within the subclasses, the common injuries are also self-evident. All of the Proposed Class Representatives and Proposed Class members have allegedly experienced either a permanent or temporary deprivation of their vehicles. *Wal-Mart*, 564 U.S. at 350; *General Telephone*, 457 U.S. at 148.

Further, while there may be a need to quantify damages on a plaintiff-by-plaintiff basis, that need does not prevent there being commonality. *Suchanek*, 764 F.3d at 756; *Arreola*, 546 F.3d at 801. The theories of liability appear to be consistently measurable across each subclass. *Comcast*, 569 U.S. at 37. The differences simply do not outweigh the substantial common issues. As was stated above, while the variables may differ, the formula is the same. Here the parties and the court can devise solutions to address that problem should this matter proceed to the stage of precise quantification of damages.

True, the City argues that it might raise defenses unique to each Plaintiff. Even without considering the efficacy of those defenses, the court concludes that that argument does not carry the day. Rule 23(a)(3) requires that the "claims *or* defenses" are typical of the Proposed Class. Here, the court concludes that the claims meet the commonality requirement. Even if the defenses were unique, that would not defeat a commonality finding based on the commonality of the claims, and the rule is written in the disjunctive. The commonality of claims is sufficient.

c.   Typicality

As noted above, Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

Here, notwithstanding the City's arguments to the contrary, it appears that the Proposed Class Representatives each have claims that have the same essential characteristics as those of the putative class. *Muro*, 580 F.3d at 492.

The City argues a number of irrelevant factors to attempt to defeat typicality. While the City acknowledges that the Proposed Class Representatives can show that they all filed a chapter 13 bankruptcy while their vehicles were impounded, they point to the existence of multiple bankruptcies and early dismissal. Neither factor has any bearing on whether the City inappropriately deprived the Proposed Class Representatives of their vehicles in violation of the requirements of the Bankruptcy Code.

Further, the City argues that some of the Proposed Class Representatives received their vehicles back following a request and some did not, and that some did not even request their

42

vehicles back.  Again, this simply does not appear relevant to the theories propounded by the Plaintiffs.  As noted above, for the purposes of class certification, the court finds that both sections 362 and 542 are self-effectuating and thus this defense is not implicated in determining typicality.

While the City may yet raise questions of demand and notice in relation to the claims asserted against it, given the proposed class definition and the existing case law applicable today, the court cannot conclude that such arguments preclude typicality.

As to the former, the Plaintiffs propose a class of those persons otherwise meeting the definition of the class who made a demand for the return of their vehicles.  The City argues that not all persons may have made such a demand and, thus, the Proposed Class Representatives are inadequate.  This argument is circular in nature.  If a potential class member did not make a demand, they do not meet the definition of the class.  This is not an issue with the adequacy of the representation, but the adequacy of the class definition.  This, in the court's view, is a question that goes to the superiority factor under Rule 23(b), not the adequacy of the Proposed Class Representatives.  Further, while the City appears to be suggesting that the Proposed Class might be broadened to include those debtors who did not demand their vehicles be returned, the court need not project what might occur in the future to rule on what is before it today.  While it is true that an order certifying a class may be later amended, *see* Fed. R. Civ. P. 23(c)(1)(C), that question is simply not before the court at this point.

As to existing case law, the same issue exists.  While it is true that failure to act in response to a demand might increase a party's right to damages, *see, e.g.*, 11 U.S.C. § 362(k) (potentially giving rise to a claim for willful violations) and thus there may be a difference in damages sought between those debtors who made a demand and those that did not, the proposed class does not include those who did not make a demand.  Further, as noted above, the issue of liability, however, is not the same as the issue of damages.  Where the liability is typical, even if the damages vary, a class may be certified.  *Bruzek*, 520 F. Supp. 3d at 1094; *Endo*, 1995 WL 170030, at *4.

The Proposed Class Representatives have affirmatively disclaimed those aspects of their potential claims so as to not threaten commonality or typicality.  Plaintiffs' Post-Hearing Brief, at pp. 10–13; Tr., Mar. 12, p. 71:19–23; Tr., Mar. 13, at pp. 25:7–21, 42:21–23, 65:19–23, 96:12–14, 126:1–4.

The court concludes here that the Plaintiffs have met their burden to establish that the Proposed Class Representatives meet the typicality requirement.

### d.    Adequacy of Representation

The question here is whether the Proposed Class Representatives will fairly and adequately protect the interests of the Proposed Class.  Fed. R. Civ. P. 23(a)(4).

The City alleges that a conflict between the Proposed Class Representatives and the Proposed Class exists, in that the Class Representatives have agreed to waive certain nonconforming aspects of their claims so as to ensure commonality.  In the City's view, this represents a conflict as potential class members may not agree to be so limited.

The court views this argument as also circular in nature.  If a potential class member does not agree to join the class, then its interests are not at the forefront of determining aspects of the

class. The question is not whether Proposed Class Representatives who waive claims adequately represent that class, but rather whether the narrow definition of the Proposed Class is somehow too limiting for class certification. In other words, this is not an issue with the adequacy of the representation, but the adequacy of the Proposed Class definition. This, in the court's view, is a question that goes to the superiority factor under Rule 23(b), not the adequacy of the Proposed Class Representatives.

Here, though the Complaint does not specifically label them as such, there are two distinct subclasses: Those Plaintiffs alleging permanent deprivation and those alleging temporary deprivation. Excluding the Plaintiff who has passed away, there are currently six Proposed Class Representatives. *See Howard*, 989 F.3d at 609–10 (confirming the trial court's ability to certify subclasses). Of those, Campbell, Brown, Hyles and Williams are clearly from the permanent deprivation subclass and Cordova and Nocentelli are clearly from the temporary deprivation subclass.

The City has, however, challenged specifically whether Brandon Brown meets the definition of the Proposed Class. Specifically, a factual dispute exists as to whether Brown in fact made a demand for the return of his vehicle. While, as noted above, the existence of a demand is not being considered today as a defense that might defeat typicality, the City makes a valid point that, if Brown has not made a demand, he does not meet the narrow definition of the Proposed Class sought to be certified by the Plaintiffs. Because this factual dispute is unresolved and the burden of proof lies with the Plaintiffs, the court finds against Brown on this point. Brown may not act as a Class Representative in this matter.

Even so, there is, therefore, adequate representation of each subclass in the Proposed Class Representatives. Campbell, Hyles and Williams are clearly from the permanent deprivation subclass and Cordova and Nocentelli are clearly from the temporary deprivation subclass and each meets the criteria discussed above. As the nature of the demand made is not relevant to the legal determinations within the definition of the Proposed Class, the City's other concerns here are not relevant.

Considering the subclasses, the Proposed Class Representatives other than Brown are thus members of the Proposed Class and possess the same interest and suffer the same injury as the class members. *Amchem*, 521 U.S. at 625–26. The court has seen no reason to question whether those Proposed Class Representatives will keep the interests of the entire class at the forefront, *Conrad*, 869 F.3d at 539, or will act in the best interests of the unnamed members of the Proposed Class. *Id.* While their interests may not be identical with each and every potential member of each subclass, that is not required. *Kamen*, 908 F.2d at 1348.

As noted above, adequacy considerations are to be based on serious challenges only because class actions should not be derailed by defendants "conjuring up trivial credibility problems or insubstantial defenses unique to the class representative." *CE Design*, 637 F.3d at 728. Here, the City's challenges seem designed to do just that, to derail the Complaint with insubstantial defenses while raising no questions of admissible evidence that severely undermine the Proposed Class Representatives' credibility. *Id.* Nothing raised by the City is so substantial as to make any of the Proposed Class Representatives inadequate. *Beaton*, 907 F.3d at 1027–28.

44

3.      Rule 23(b)

As discussed above, Rule 23(b) adds three additional criteria for class certification, only one of which must be satisfied for a class to be certifiable. *Wal-Mart*, 564 U.S. at 345. The Plaintiffs in this matter have focused solely on Rule 23(b)(3).

Rule 23(b)(3) requires the plaintiff to show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Therefore, plaintiffs must show that both predominance and superiority exist.

a.      Predominance

The court has considered each of the elements of the Counts under section 542 and sections 362, as set forth above and in *Cordova*. *Santiago*, 19 F.4th at 1018 ("Only by properly circumscribing the claims and breaking them down into their constituent elements can a district court decide which issues are common, individual, and predominant."). Here, common questions predominate over individual ones. *Comcast*, 569 U.S. at 34; *see also Messner*, 669 F.3d at 815 ("Common questions represent a significant aspect of a case and ... can be resolved for all members of a class in a single adjudication.") (citations, brackets and internal quotation marks omitted).

Here, given the narrow definition of the Proposed Class and damages arising therefrom, other than in quantifying damages individually based on a formula where variables can be altered, there will be no need to present evidence that varies from member to member. The same evidence will suffice for each member to make a *prima facie* showing. That makes this not an individual question. The City is quite simply incorrect that issues of whether a demand was made, a case was dismissed or multiple cases exist give rise to such individual questions. These are not elements of the claims, as was discussed above.

Considering the non-exhaustive list of "matters pertinent" to help a court's findings on these two requirements, including: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action," Fed. R. Civ. P. 23(b)(3)(A)–(D), the court sees no issues that run contrary these conclusions. None of the Proposed Class Representatives have been shown to have interests in individually controlling the prosecution or defense of separate actions or have litigated the controversy already. The forum is clearly defined as this court is where the alleged injuries occurred. There are no apparent difficulties in managing a class action.

b.      Superiority

As noted above, the second part of Rule 23(b)(3) looks at "whether class action is a superior method of adjudicating the dispute." *Wal-Mart*, 564 U.S. at 362–63. This is a pivotal concern in this matter.

As discussed above, the proposed class consists of the poorest demographic in the City. These are parties that filed for bankruptcy, presumably because they were unable to pay their debts. Despite the protections afforded by bankruptcy, chapter 13 debtors are particularly vulnerable. *See,*

45

*e.g.*, *In re Davis*, Case No. 22-33500, 2023 WL 4629434, at *1 (Bankr. S.D. Tex. July 19, 2023) (noting that chapter 13 debtors are vulnerable to unscrupulous bankruptcy petition preparers); *In re Tabor*, 583 B.R. 155, 202 (Bankr. N.D. Ill. 2018) (Barnes, J.) (sanctioning attorney for preying on vulnerable chapter 13 debtors).

"Chapter 13 was arguably intended as a simplified, cut down approach to reorganizations for individuals with less complex cases and regular income. *See* H.R. Rep. No. 95-595, at 116–18 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6076, 6078 (describing the need to simplify consumer reorganizations)." *In re Shelton*, 592 B.R. 193, 204 (Bankr. N.D. Ill. 2018) (Barnes, J.). That intention, however, has not come to fruition. Chapter 13 is one of the most difficult chapters of the Bankruptcy Code to navigate. *Id.*; *see also In re Bolden*, Case No. 23-21459-RMB, 2024 WL 3403205, at *23 (Bankr. E.D. Wis. July 12, 2024) (chapter 13 cases "involve consideration of many complex statutes and legal principles"). Doing so without the assistance of counsel almost always results in a case's failure. Ed Flynn, *Success Rates in Chapter 13*, ABI JOURNAL 38–39, 56–57 (Aug. 2017) (noting that "[o]nly about one in 45 *pro se* chapter 13 cases results in a completed repayment plan."). Because of this, the court has implemented a system of counsel compensation in chapter 13 cases. *In re Gilliam*, 582 B.R. 459, 469 (Bankr. N.D. Ill. 2018) (Barnes, J.) (describing same). That system, the use of which has been expressly approved by the Seventh Circuit, *In re Geraci*, 138 F.3d 314, 318 (7th Cir. 1998), allows debtors to access counsel at relatively lower rate. One of the tradeoffs in that system is that counsel engaged under that system are not required to assist debtors in more complex disputes without additional compensation. Debtors rarely can afford to engage counsel for such matters.

At the same time, the City has shown a propensity to fight these issues vigorously, including, as applicable, on appeal. The City has taken matters relating to its parking ticket system to the Supreme Court, where it achieved a modicum of success. *City of Chicago v. Fulton*, 502 U.S. 154 (2020). The court considered the effect of the *Fulton* decision in *Cordova*. *Cordova*, 635 B.R. at 342–43. The City has engaged sophisticated and presumably expensive outside counsel to defend itself here and in *Jones*.

This leads to an obvious conclusion. Even if the Plaintiffs are correct and the City's alleged actions violate the Bankruptcy Code, forcing the Proposed Class members to litigate these matters individually with the City is a losing proposition. Individual, bankrupt debtors will never be able to match the deep pockets of the City. This kind of situation is exactly what the superiority criteria is meant to address. *Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.") (quoting *Mace*, 109 F.3d at 34). As noted above, when causes of action redound on unsophisticated plaintiffs or in a way that individual plaintiffs might be disadvantaged in pursuing their rights individually, this factor is satisfied. *Ramirez*, 250 F.R.D. at 374.

As discussed above, courts also look at manageability when determining whether a class action is superior. *Steel Antitrust Litig.*, 2015 WL 5304629, at *12. Courts must "take a 'practical, on-the-ground assessment of whether the proposed efficiencies from a class action will outweigh the administrative problems and inefficiencies expected to ensure.'" *Id.* (quoting *Hamilton*, 2006 WL 1697171, at *13).

46

Here it is not lost on the court that one of the City's arguments is that each Plaintiff's chapter 13 case must be reopened to afford it relief. While the court has rejected that argument, the making of this argument by the City underscores what may be its tactics should this matter not be certified—to make individual recovery so burdensome and expensive that the City might win a war of attrition. Further, the City has argued here that, as several of the Proposed Class Representatives have indicated they may wish to pursue the City separately for damages outside of the Proposed Class definition, that defeats superiority. In the court's view, it does not. As Rule 23(c)(4) expressly permits an action to be maintained on particular issues, Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."), that issues might be justiciable outside of the class action does not disqualify a matter from consideration as a class action. As the Seventh Circuit has written, "the superiority requirement 'functions as a backstop against inefficient use of Rule 23(c)(4)' because it 'ensures that courts will not rely on issue certification where there exist only minor or insignificant common questions.'" *Jacks*, 118 F.4th at 898 (citing to *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018)). The point in *Jacks* is this, a court should not use issue certification to subvert the superiority requirement. Here, it is the opposite. Hearing the issues in common in this litigation is clearly superior, for the reasons stated throughout this Memorandum Decisions.

There are other arguments in favor of superiority. If counsel's fees are capped by statute, *see, e.g.*, 28 U.S.C. § 2412(d)(2)(A), a question that appears well-defined by the statute but on which the court does not rule on today, that cap would further disadvantage debtors by making it less likely counsel would assist them in pursuing these issues. That the present counsel are willing to accept the role here on behalf of the Plaintiffs when their compensation is unclear is not an indicator that others will do the same.

It is clear therefore to the court that the superiority factor of Rule 23(b) clearly favors the Plaintiffs.

4.      Rule 23(g)

Finally, the court considers the propriety of the counsel in this matter to act as class counsel in this case should certification be granted.

As was discussed above, the court is required to examine propriety of class counsel. Fed. R. Civ. P. 23(g)(1); *Culver*, 277 F.3d at 913. In appointing class counsel, the court must "consider counsel's work on the case to date, counsel's class action experience, counsel's knowledge of the applicable law, and the resources counsel will commit to the case." *Reliable*, 704 F.3d at 498 n.7. In addition to the mandatory considerations, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). A pertinent matter would be counsel's misconduct or ethical breach. *Reliable*, 704 F.3d at 498.

There can be no question that the work of counsel to the Plaintiffs in this matter has been substantial. There have been multiple complaints, motions to dismiss, discovery, a hotly contested evidentiary hearing and reams of filings on top of that all. No one can seriously question the amount of work that has been performed. As has been noted herein and in *Cordova*, however, a number of the litigation decisions made by counsel in this matter have been questionable. The method by which Plaintiffs were joined and Proposed Class Representatives were identified were

47

inartful and the overly narrow definition of the Proposed Class seems unnecessary, for example. That said, the City's counsel has also made mistakes, some of which are noted herein. The questions, however, are not who has made mistakes and in what number, but whether the counsel has made any material errors or has acted in a way that causes the court to call into question their ability to proceed in this matter. The answer to each is no. While the court might question whether counsel is the best counsel for this matter, the decision here is not whether proposed counsel is the best situated to represent the Proposed Class. The question is whether they are adequate. Perfect, in this situation, is the enemy of good. The court has no reason to question their adequacy.

The City also questions counsel's experience and makes allegations regarding past misconduct by counsel. In so doing, the City downplays counsel's experience in the *Barrios* matter and in *Jones*. The court does not. That counsel has trod this path before with the City is experience that is hard to replicate. It would be disingenuous of the court to find that being involved in only three class action cases disqualified one from participation in this matter. Further, the allegations of misconduct made by the City, even if true, do not rise to the level of actionability under the applicable case law. *Reliable*, 704 F.3d at 498 (rising to the level of prejudicing the class or creating a direct conflict between counsel and the class). The court has no serious doubt that counsel will represent the Proposed Class loyally or belief that counsel has demonstrated a lack of integrity. *Creative Montessori*, 662 F.3d at 918. Finally, the court notes that the Plaintiffs' counsel is not alone in committing errors in this matter. Nothing by either party has risen to the level of disqualification.

There has also been nothing that causes the court to question counsel's knowledge of the substantive law in question. The bankruptcy issues involved are fundamentally basic in nature, and the court has detected no material gaps in counsel's knowledge of the same. The same holds true to the resources available to counsel. There is no cause to question counsel's ability to dedicate what resources are necessary to see this matter through to the end.

Finally, the court is also relatively assured that, given its ruling today certifying this matter, more experienced or more resourced counsel working with entities interested in this overall set of circumstances may either join counsel in this matter or make themselves available for consultation. Even should that not occur, counsel has met the requirements of Rule 23(g).

D.    Conclusion

Having considered the requirements of Rule 23(a), Rule 23(b) and Rule 23(g), the court concludes that the Plaintiffs have met the standards for certification of this matter. Is this a perfect case under those rules? No. But the court is cognizant of the directions of the Seventh Circuit to not allow trivial or insubstantial concerns to derail consideration. *CE Design*, 637 F.3d at 728. Further, as the case law makes abundantly clear, this is not a ruling on the merits of the action as a whole. *Simpson*, 23 F.4th at 711 (if the requirements of Rule 23 are met, "the class *must* be certified, even if it is sure to fail on the merits) (emphasis in original).

This matter meets the requirements and therefore must be certified.

CONCLUSION

For the reasons stated above, as to the Motion to Exclude, the court will DENY the Motion. The Certification Motion will be GRANTED.  The court will enter concurrently herewith a separate order to that effect.

Dated:  March 10, 2025                                    ENTERED:

                                                                    _____
                                                                    Judge Timothy A. Barnes
                                                                    United States Bankruptcy Court